Robert D. Sherlock (Utah Bar No. 02942; *admitted pro hac vice*)
Sarah Wade (Utah Bar No. 15477; *admitted pro hac vice*)
rsherlock@egclegal.com
swade@egclegal.com
EISENBERG, GILCHRIST & CUTT
215 South State Street, Suite 900
Salt Lake City, Utah 84111
Telephone 801-366-9100
Fax 801-350-0065

Attorney for Qui Tam Plaintiffs/Relators

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel*. AARON FISHER, RISA COHEN, JOHN GUTZWILLER, DEBRAH HARTMAN, CYNTHIA LIMON, AND CATHERINE NOWAK, <br><br> Plaintiffs, <br><br> vs. <br><br> IASIS HEALTHCARE LLC, a Delaware Limited Liability Company; <br><br> HEALTH CHOICE of ARIZONA, INC., a Delaware Corporation; <br><br> HEALTH CHOICE NORTHERN ARIZONA LLC, A Delaware Limited Liability Company; <br><br> HEALTH CHOICE MANAGEMENT CO., INC., A Delaware Corporation; <br><br> PHYSICIAN GROUP OF ARIZONA, INC., An Arizona Corporation; <br><br> ST. LUKE'S BEHAVIORAL HOSPITAL, LP, A Delaware Limited Partnership; | **Civil Action No.** <br><br> **CV 15-00872-PHX-JJT** <br><br> **THIRD AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

ST. LUKE'S MEDICAL CENTER, LP,  A
Delaware Limited Partnership;

MOUNTAIN VISTA MEDICAL CENTER,
LP, A Delaware Limited Partnership;

HERITAGE TECHNOLOGIES LLC,  an
Arizona Limited Liability Company;

NORTHERN ARIZONA
DERMATOLOGY CENTER, P.C. an
Arizona Professional Corporation;

NORTH COUNTRY HEALTHCARE
INC., an Arizona Corporation;

MOMDOC, LLC, an Arizona Limited
Liability Company;

DRS. GOODMAN & PARTRIDGE, LLC,
an Arizona Limited Liability Company;
(also dba "MOMDOC");

GENESIS OBGYN, PC, an Arizona
Professional Corporation;

AND  JOHN DOES #1-10, FICTITIOUS
NAMES

                    Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100·Fax (801) 650-0065

TABLE OF CONTENTS

I. INTRODUCTION ……………………………………………………...5

II. JURISDICTION & VENUE …………………………………………....6

III. PARTIES ……………………………………………………………7

    A. Relators ……………………………………………………….7

    B. Defendants ………………………………………………..…8

IV. FEDERAL STATUTES AND REGULATIONS APPLICABLE TO

    DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS  ………………….11

    A. The Federal False Claims Act ………………………………11

    B. The Anti-Kickback Statute ………………..…………………12

V. FEDERAL GOVERNMENT HEALTH PROGRAMS ……………………..…14

    A.  Medicare Managed Care ……………………………….....14

    B. Federal Government Health Programs…....................15

    C. The Arizona Health Care Cost Containment

        System (AHCCCS) …………………………………….....18

VI. MATERIAL OBLIGATIONS AND REQUIREMENTS OF CONTRACTORS

    AND SUBCONTRACTORS…………………………………..……22

    A. Medical Necessity, Cost Effectiveness and Compliance with

        Federal and State Guidelines, Policies and Manuals…………..22

    B. Quality of Care—Credentialing and Network Development ….25

    C. Provider Enrollment and Participation in AHCCCS…………26

    D. Profit Control Measures and Limitations…………………..…27

VII. IASIS AND HEALTH CHOICE CONTRACTS WITH AHCCCS  …………..28

VIII. DEFENDANTS' SCHEMES TO KNOWINGLY AND INTENTIONALLY

    DEFRAUD AHCCCS……………………………………………30

    A. Anti-Kickback Violations:  The "Gold Card" System of

      "Waivers" of Mandatory and Required Prior Authorizations

      for Services……………………………………………………30

B. KICKBACKS TO PARTICIPATING CLINICS TO UNDERWRITE

THEIR COSTS OF OBTAINING PRIOR AUTHORIZATIONS……………………………40

    C. ANTI-KICKBACK VIOLATIONS: THE "PLATINUM STATUS" SYSTEM TO
      BYPASS CLAIMS REVIEW, DIRECT PAYMENT OF ANY SUBMITTED
      CLAIM, AND "ADMINISTRATIVE APPROVAL" OF CLAIMS……………..…42

    D. RECKLESS DISREGARD OF TRUTH OR FALSITY OF CLAIMS:  CREATION OF
      FALSE "PRIOR AUTHORIZATION" CODES TO PERMIT PAYMENT OF
      CLAIMS FOR WHICH REQUIRED PRIOR AUTHORIZATION
      WAS NOT OBTAINED………………………………………………..…..44

    E.  RECKLESS DISREGARD OF MEDICAL NECESSITY: HEALTH CHOICE
      FAILED AND REFUSED TO APPLY CONSISTENT CRITERIA TO ANY PRIOR
      AUTHORIZATION MEDICAL DECISIONS……………………………46

    F. RECKLESS DISREGARD OF MEDICAL NECESSITY: SPECIAL DISPUTE
      RESOLUTION PROCESSES FOR IASIS FACILITIES……………………….…47

    G. RECKLESS DISREGARD OF MEDICAL QUALIFICATIONS OF ITS
      PROVIDERS:  FAILING TO MAINTAIN AND REQUIRE PROPER
      CREDENTIALING OF ITS PROVIDER NETWORK  …………………………..49

IX. HEALTH CHOICE HAS ACTUAL KNOWLEDGE OF ITS FAILURE TO
    PERFORM MATERIAL REQUIREMENTS OF ITS CONTRACT WITH
    AHCCCS……………………………………………….……………………51

X. CLAIMS FOR RELIEF …………………………………….……56
    FIRST CLAIM FOR RELIEF …………………………………56
    SECOND CLAIM FOR RELIEF …………………………….....58
    THIRD CLAIM FOR RELIEF …………………………..………..59
    FOURTH CLAIM FOR RELIEF ………………..……..…60

XI. PRAYER FOR RELIEF ………………………………………61

XII. DEMAND FOR TRIAL BY JURY…..……………………………..62

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

# I. INTRODUCTION

1. On behalf of the United States of America pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, Plaintiffs/Relators Aaron Fisher, Risa Cohen, John Gutzwiller, Debrah Hartman, Cynthia Limon, and Catherine Nowak, jointly file this *qui tam* Complaint against Defendants for fraudulent payment of claims and fraudulent processing of claims, material failures to perform Medicaid and Medicare contract requirements, and receiving government contracts and funds on the basis of false certifications of compliance with these same requirements and regulations. Relators seek treble damages, and civil penalties arising from Defendants' conduct described herein.

2. This action concerns improper and unlawful false records, certifications and statements made by Defendants, in order to, *inter alia*, conceal and misrepresent to Medicaid authorities and the federal government Defendants' fraudulent transfer of funds to its own facilities, fraudulent non-performance of material contract obligations, and fraudulent misrepresentation of their intent to perform these material obligations in order to secure Arizona Medicaid contracts in violation of 31 U.S.C. § 3729(a).

3. Relators discovered these violations in the course of their work at Defendants Health Choice, *et al*. They conducted their own investigation in furtherance of a False Claims Act *qui tam* action. They bring this action on behalf of the United States to recover damages for the false claims that have been and continue to be submitted.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

## II. JURISDICTION AND VENUE

4. This action is brought on behalf of the United States Government under 31 U.S.C. § 3729, *et seq.*, commonly known as the False Claims Act ("FCA"). Relators bring this action under 31 U.S.C. § 3730(b) to recover for false claims which Defendants IASIS, et al.,  knowingly submitted or caused to be submitted, and were made, used, or caused to be made or used in violation of 31 U.S.C. § 3729.

5. This Court has jurisdiction over such FCA claims pursuant to 31 U.S.C. § 3730(b), 31 U.S.C. § 3732(a), and 28 U.S.C. § 1331.

6. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants IASIS, et al, transact business in this District and/or because one or more of the acts proscribed by the False Claims Act occurred in this District.

7. Relators' claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is or has been a party, as enumerated in 31 U.S.C. § 3730(e)(3).

8. To the extent that there has been a public disclosure unknown to the Relators, Relators are the "original source" and meet the requirements under 31 U.S.C. § 3730(e)(4)(B). To the extent there has been a public disclosure of any facts or other matters relevant to this Complaint, Relators' allegations herein are based on their knowledge that is independent of and materially adds to  publicly disclosed allegations or transactions – if any – and meets the requirements under 31 U.S.C. § 3730(e)(4)(B).

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

### III. PARTIES

**A. RELATORS**

9. Plaintiff  Relator Aaron Fisher ("Relator") is a resident of Phoenix, Arizona. He holds a Bachelor's Degree in Dental Health and is a Registered Dental Hygienist. He also holds a Master's Degree in Public Health. As of the date of this Third Amended Complaint he is employed as the Oral Health Dental Program Manager for Health Choice.

10. Plaintiff   Relator Risa Cohen ("Relator") is a resident of Arizona. She is a Medical Doctor and also holds a Doctorate Degree in Public Health. She is a fellow of the American College of Cardiology.  She was formerly employed by Health Choice Arizona as the Medical Director of Health Choice.

11. Plaintiff   Relator John Gutzwiller ("Relator") is a resident of Arizona. He holds a Bachelor's Degree in Psychology and a Nursing degree.  He was formerly employed by Health Choice Arizona as the Senior Director of Medical Services. In that capacity he oversaw the day-to-day operations of utilization management, case management, oral health, and prior authorization among other departments.

12. Plaintiff  Relator Debrah Hartman ("Relator") is a resident of Arizona. She holds a Bachelor's Degree in Nursing and is a Registered Nurse. She also holds Master's Degrees in Business Administration and Healthcare Administration. She was formerly employed as the Senior Director for Quality Management for Health Choice

Arizona.

13. Plaintiff   Relator Cynthia Limon ("Relator") is a resident of Arizona. She was formerly employed as managerial level employee of Defendant Health Choice.

14. Plaintiff   Relator Catherine Nowak ("Relator") is a resident of Arizona. She is a Registered Nurse with a Bachelor's Degree in Nursing. She was formerly employed by Health Choice Arizona as a Director of Utilization Management and Prior Authorization Medical Services.

15. Relators have direct and independent knowledge regarding the matters set forth herein. In particular, Relators have direct and independent knowledge regarding Defendants' utilization management and prior authorization policies and actual practices, the credentialing and selection/retention of providers, and all other related matters as alleged herein.

**B. DEFENDANTS**

16. Defendant IASIS Healthcare LLC is a hospital management company that owns or leases at least 16 acute care hospital facilities and one behavioral health hospital facility with a total of 4,365 licensed beds and has total annual net revenue of approximately $2.6 billion. These hospital facilities are located in seven regions: Salt Lake City, Utah; Phoenix, Arizona; Tampa-St. Petersburg, Florida; five cities in Texas, including Houston and San Antonio; Las Vegas, Nevada; West Monroe, Louisiana; and Woodland Park, Colorado. IASIS also owns and operates Defendant Health Choice Arizona, a Medicaid and Medicare managed care organization currently providing services in Arizona.  Defendant IASIS Healthcare LLC participated in the direction and

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

strategic planning underlying the schemes detailed herein and directly received funds generated by the schemes.

17. Defendant Health Choice Arizona (the Plan or Health Choice) is a division of Health Choice Arizona, Inc. (the Parent), which is a wholly owned subsidiary of IASIS Healthcare LLC (IASIS).The Plan is a prepaid Medicaid managed health plan that derives all of its revenue through a contract with the Arizona Health Care Cost Containment System (AHCCCS), the state agency that administers Arizona's Medicaid program.  Defendant Health Choice Arizona provides specified healthcare services to qualified Medicaid enrollees through its subcontracts with providers, including affiliates of IASIS. Under the "Health Choice Arizona" umbrella, Health Choice Arizona, Inc. operates a number of other plans, each organized as a separate legal entity but all operating in unison under the same functional leadership and corporate control.

18. Defendant Health Choice Management Company, a wholly-owned subsidiary of Defendant IASIS, is a management services organization which manages the general and administrative functions related to Health Choice of Arizona, including its payroll, advertising and related expenses. During the 2014 Health Choice fiscal year, it paid $41,670,000  to the Management Company, which is included in its annual administrative expenses. Health Choice Management Company  is a Delaware limited liability company doing business in the state of Arizona. Health Choice Management Company directly participated  in the schemes detailed  herein.

19. Defendant Physician Group of Arizona, Inc. is a wholly-owned subsidiary of Defendant IASIS, incorporated in Delaware and doing business in Arizona. It employs,

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

contracts with, or otherwise serves physicians practicing in IASIS facilities and practicing under contractual relationships as the network of physicians for other third-party payors as well.

20. Defendants St. Luke's Medical Center, LP, St. Luke's Behavioral Hospital, LP, St. Luke's Medical Center dba Tempe St. Luke's Hospital, and Mountain Vista Medical Center, LP, are all Arizona hospitals owned by Defendant IASIS and operating under separate corporate or other legal identities. All are incorporated or otherwise organized in the State of Delaware, with principal places of business in the State of Arizona.

21. Defendant Heritage Technologies,LLC,  is an Arizona limited liability company doing business as Desert Grove Family Medical at three locations in the greater Phoenix, Arizona area. A managing member of Heritage Technologies, LLC is Defendant IASIS Healthcare, LLC. Defendant Heritage Technologies, LLC as further described in this complaint, received kickbacks from Defendant Health Choice in the form of its "Gold Card" status.

22. Defendant North Country Healthcare, Inc. is an Arizona Corporation rendering services as North Country Healthcare, in Flagstaff, Arizona. Defendant North Country Healthcare, as further described in this Complaint, received kickbacks from Defendant Health Choice in the form of its "Gold Card" status.

23. Defendant Northern Arizona Dermatology Center, PC, is an Arizona Professional Corporation rendering healthcare services in the northern Arizona areas, with a home office in Flagstaff, Arizona. Defendant Northern Arizona Dermatology

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

Center, PC, as further described in this Complaint, received kickbacks from Defendant Health Choice in the form of its "Gold Card" status.

24. Defendants MOMDOC, LLC, and Drs. Goodman and Partridge, LLC are Arizona Limited Liability Companies with principal places of business in Chandler, Arizona. According to the records of the Arizona Secretary of State, since March 2016 MOMDOC, LLC, is the owner of the trade name "Drs. Goodman and Partridge OB/GYN." Since July 1, 2010, Drs. Goodman and Partridge, OBGYN, LLC, is the owner of the trade name "MOMDOC." These defendants received kickbacks in the form of "Gold Card" status which specifically included "Gold Card" status for high cost and high volume diagnostic imaging services.

25. Defendant Genesis OB/GYN, PC, is an Arizona Professional Corporation with a principal place of business in Tucson, Arizona. This defendant received kickbacks from Defendant Health Choice in the form of its "Gold Card" status.

## IV. FEDERAL STATUTES AND REGULATIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### A. THE FEDERAL FALSE CLAIMS ACT

26. Pursuant to the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A) *et seq.*, a cause of action arises when any person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval or creates a false record or statement to decrease an obligation to transmit money owed to the United States Government.

27. As defined under 31 U.S.C. §3729(b)(1), "knowing" and "knowingly" means: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information.  No proof of specific intent to defraud is necessary.

28. The False Claims Act further provides that the relator shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount is not less than 15% and not more than 25% of the proceeds of the action if the Government intervenes in the case, or not less than 25% nor more than 30% if the Government does not intervene. The relator shall also receive an amount for reasonable expenses, attorney's fees and costs. All such expenses, fees and costs shall be awarded against the Defendants.

**B. THE ANTI-KICKBACK STATUTE**

29. The Medicare and Medicaid Patient Protection Act, also known as the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), was enacted in 1972  and amended in 1977 to prohibit receiving or paying "any remuneration" to induce referrals. In addition to criminal penalties, a violation of the AKS can subject the perpetrator to exclusion from participation in federal health care programs, 42 U.S.C. § 1320a-7(b)(7), as well as civil monetary penalties of $50,000 per violation, 42 U.S.C. § 1320a-7a(a)(7), and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose, 42 U.S.C. § 1320a-7a(a).

30. The AKS prohibits any person or entity from knowingly and willfully offering to pay or paying any "remuneration" to another person to induce that person to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

under a Federal health care program. This includes any State health program or health program funded in part by the federal government. 42 U.S.C. §§ 1320a-7b(b), 1320a-7b(f).

31. The statute provides, in pertinent part:

> [W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
>
> 42 U.S.C. § 1320a-7b(b).

32. In the Patient Protection and Affordable Care Act ("PPACA) the AKS was amended to explicitly state that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act ("PPACA"), Pub.L. No. 111-148, 124 Stat. 119 § 6402(f) (2010) (codified as amended at 42 U.S.C. § 1320a-7b(g)).

33.  "Kickbacks" are broadly defined to include payments, gratuities, and other benefits provided to physicians.  For purposes of the AKS the term "remuneration" includes the transfer of *anything of value*, directly or indirectly, overtly or covertly, in cash or in kind.

34. Compliance with the AKS is a precondition to participation as a health care provider under federally-funded healthcare programs including but not limited to state

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

Medicaid programs. In addition, compliance with the AKS is a condition of payment for claims for which Medicare or Medicaid reimbursement is sought by medical providers.

## V. FEDERAL GOVERNMENT HEALTH PROGRAMS

### A. MEDICARE MANAGED CARE

35. The Balanced Budget Act of 1997 established a new Part C of the Medicare program, known then as Medicare+Choice (M+C), effective January 1999. Part C was subsequently renamed Medicare Advantage or MA. Part C authorized CMS to contract with public or private organizations to offer a variety of health plan options for beneficiaries, including both traditional managed care plans and new options that were not previously authorized.

36. Currently, four types of MA plans are authorized under Part C of Medicare, including:  (a) coordinated care plans such as Health Maintenance Organizations (HMOs); Provider Sponsored Organizations (PSOs); and Preferred Provider Organizations (PPOs), (b) Medicare Medical Savings Account (MSA) plans; (c) Private Fee for Service (PFFS) plans;  and (d) Special Needs Plans (SNPs). Medicare SNPs are a type of Medicare Advantage Plan (like an HMO or PPO). Medicare SNPs limit membership to people with specific diseases or characteristics and tailor their benefits, provider choices, and drug formularies to best meet the specific needs of the groups they serve.

37. Defendant Health Choice operates and offers Health Choice Generations HMO SNP which is a dual-eligible special needs program under Medicare. Health

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

Choice Generations HMO is a Coordinated Care Plan with a Medicare contract and a contract with the Arizona Medicaid program (AHCCCS). It is available only to members with both AHCCCS and Medicare Parts A & B. Defendant Health Choice utilized the same network of providers, including providers to whom it had provided kickbacks and waived medical necessity/prior authorization reviews (as described later in this complaint) for providing services under the Health Choice Generations HMO SNP.

**B. FEDERAL GOVERNMENT HEALTH PROGRAMS -- ARIZONA MEDICAID MANAGED CARE**

38. Medicaid was established by Title XIX of the Social Security Act of 1965, 42 U.S.C. §1396-1396v.  Medicaid is a jointly funded federal-state program and enables states to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary medical services. Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program, in accordance with Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*

39. A managed care organization (MCO) contracting with a State to administer Medicaid benefits must comply with both state and federal rules and regulations that are applicable to such organizations under federal law, the state's Medicaid plan (as approved by the Department of Health and Human Services), and any federal waivers granted to the state. 42 CFR §438.602.

40. **Waivers and Demonstration Projects**:   Pursuant to Section 1115 of the Social Security Act, 42 U.S.C. 1315 (a), states may apply to CMS for authority to engage in experimental, pilot or demonstration projects that are likely to assist in promoting the objectives of  the Medicaid program. These "Section 1115 waivers" allow a state to apply for specific waivers of portions of the Social Security Act, including operating a managed care model Medicaid program.  Under Section 1115, the Department of Health and Human Services is given latitude, subject to the requirements of the Social Security Act, to consider and approve research and demonstration proposals with a broad range of policy objectives.

41. Arizona currently has approval from HHS for a Section 1115 waiver. This waiver is currently expected to expire on September 30, 2016 and allows Arizona to operate its managed care model. Arizona has applied for a continuation of this waiver and waiver of certain other provisions of the Social Security Act. No current, prior, or future waiver under Section 1115  constitutes a waiver of any of the provisions of state or federal law or regulation at issue in this complaint.

42. **Federal Medical Assistance:**   The Federal Government pays a portion of Medicaid costs through the Federal Medical Assistance Percentage (FMAP).   In Arizona, the Federal government in FY 2014 paid for approximately 67.23 % of all Medicaid health care services, rising to 68.46% for FY 2015. The State of Arizona funds the remaining percentage.

43. The Federal government pays each state for this portion of the Medicaid program through quarterly grants.  To receive Federal Medicaid managed care grants

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

each state submits a quarterly estimate to the United States for estimated costs,

including an estimate for MCO services. The quarterly estimate is submitted on a Form

CMS 37, which includes a certification that

> . . . budget estimates only include expenditures . . . that are allowable in accordance with the applicable federal, state, and local statutes, regulations,   policies, and the state plan approved by the Secretary and in effect during the      fiscal year under  Title XIX of the Act for the Medicaid Program.

44. The United States uses the estimate in the CMS 37 to make grant awards

for that quarter. The award authorizes the state to draw federal funds as needed through

a line of credit.

45. At the end of each quarter, the state submits its quarterly expenditure report,

Form CMS 64, which details each state's actual expenditures. The form must be

executed and certified by the executive officer of the state agency or his/her designee.

The capitation payments to MCO's are included in Form CMS 64, which includes the

same certification as in the CMS 37:

> This report only includes expenditures under the Medicaid program  . . .  that are allowable in accordance with applicable implementing federal, state, and local statutes, regulations, policies, and  the state plan approved by the Secretary and in effect during the Quarter . . . .

46.  Medicaid programs, including Medicaid managed care programs, constitute

"Federal Health Care Programs" as defined in 42 U.S.C. § 1320a-7b(b).

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

47. Expenditures or payments under the Medicaid program that are made pursuant to a kickback induced scheme are not allowable and not reimbursable under applicable implementing federal and state statutes and regulations.

**C. THE ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM (AHCCCS)**

48. The Arizona Health Care Cost Containment System (AHCCCS) is Arizona's Medicaid agency that offers health care programs to serve Arizona residents, including the Medicaid managed care programs described above.

49. AHCCCS, including its requirements for contractors providing insurance plans under AHCCCS, is governed by Title 9, Chapter 22 of the Arizona Administrative Code. Its requirements are incorporated by reference as material provisions of any Plan contracted to cover eligible Medicaid beneficiaries in the state.

50. The functions and standards governing the operations and requirements for every contractor are delineated in Arizona Revised Statutes (ARS) § 36-2901 *et seq.*, and Arizona Administrative Code (AAC) Articles 5 and 9-22-501. This Code is incorporated by reference in every AHCCCS managed care contract.

51. In order to deliver health care services, each contractor including Defendant Health Choice Arizona develops networks of sub-contracted providers, broadly considered the contractors' network. This network consists of those physicians, other providers, hospitals, clinics, medical equipment suppliers, and the like with whom the contractor has entered into sub-contracts to deliver services based on the contractors' payment rates.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

52.  Notwithstanding these subcontracts, the contractor remains fully responsible for all aspects of contract performance and is required to assure that all activities carried out by the subcontractor conform to the provisions of this contract:

> SUBCONTRACTS:  The Contractor shall be legally responsible for contract performance whether or not subcontracts are used [42CFR 438.230(a) and 434.6(c)]. No subcontract shall operate to terminate the legal responsibility of the Contractor to assure that all activities carried out by the subcontractor conform to the provisions of this contract. Subject to such conditions, any function required to be provided by the Contractor pursuant to this contract may be subcontracted to a qualified person or organization [42 CFR 438.6]. All such subcontracts must be in writing [42 CFR 438.6(l)]. See ACOM Policy 203.

> AHCCCS RFP No. YH14-0001

53. The requirements of these subcontracts are regulated by AHCCCS, and regulated under the Arizona administrative code. AHCCCS, in order to ensure these same obligations are carried forward to the subcontracts, has minimum requirements that are mandatory in all subcontracts.

54.  Minimum Subcontract Provisions (MSPs), are referenced and incorporated into the AHCCCS Provider Participation Agreement as well as AHCCCS Medicaid Contracts. AHCCCS' minimum requirements for subcontracts include but are not limited to:

> 2. By signing this subcontract, the Subcontractor certifies that it has not engaged in any violation of the Medicare Anti-Kickback statute (42 USC §§1320a-7b) or the "Stark I" and "Stark II" laws governing related-entity referrals (PL 101-239 and PL 101-432) and compensation there from. . . .
>
> 3. The Subcontractor shall comply with all Federal, State and local laws, rules, regulations, standards and executive orders

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

governing performance of duties under this subcontract, without limitation to those designated within this subcontract. [42 CFR 434.70] [42 CFR 438.6(l)]

4. The terms of this subcontract shall be subject to the applicable material terms and conditions of the contract existing between the Contractor and AHCCCS for the provision of covered service.

AHCCCS Minimum Subcontract Provisions

55. **Encounter Reporting:** A primary ongoing report submitted by a managed care contractor, including Defendant Health Choice, to AHCCCS is the Encounter Data Report. An encounter is the record of a Medicaid covered service reported on an inpatient or outpatient claim submitted to a managed care contractor. The contractor is required to submit an Encounter Report for all valid Medicaid-covered services, including those paid, administratively denied or for which no Medicaid payment was due, by reason of full reimbursement by another payor or bundling of services.

56. Submission of encounter data to AHCCCS is a mandatory requirement established by CMS and is the responsibility of the Contractor pursuant to its contract with AHCCCS.

57. Complete, accurate and timely reporting of encounter data is crucial to the success of the AHCCCS program. AHCCCS uses encounter data to pay reinsurance benefits, set Fee-For-Service and capitation rates, determine reconciliation amounts, determine disproportionate share payments to hospitals, and to determine compliance with performance standards. The Contractor is

required to submit encounter data to AHCCCS for all services for which a Contractor incurred financial liability and claims for services eligible for processing by the Contractor where no financial liability was incurred including services provided during prior period coverage. This requirement is a condition of the CMS grant award [42 CFR 438.242(b)(1)][42 CFR 455.1(a)(2)].

58. The reported service must be covered by AHCCCS according to Section D-Program requirements of the Contractor's AHCCCS agreement and as further defined by the AHCCCS Medical Policy Manual (AMPM).

59. The AHCCCS Medical Policy Manual (AMPM), Chapter 300, states: *"All covered services must be medically necessary and provided by a primary care provider, or other qualified providers as defined in Chapter 600 of this Manual."*

60. **Contractor Encounter Attestation:** To comply with 42 CFR Sections 438.604 and 438.608 the CEO, CFO or a direct report must certify encounter data prior to processing.

61. The attestation process requires the Chief Executive Officer, Chief Financial Officer, or an individual who has delegated authority to sign for, and who reports directly to Chief Executive Officer or Chief Financial Officer, to attest that the data and/or documents so recorded and submitted as input data or information, based on best knowledge, information, and belief, is in compliance with Subpart H of the Balanced Budget Act (BBA) Certification requirements; is complete, accurate, and truthful; and is in accordance with all Federal and State laws, regulations, policies and the AHCCCS/Contractor contract in effect.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

62. Services that lack medical necessity or arise from a kickback scheme are not covered services.  Including any such services and reporting the same on an Encounter Data Report (upon which AHCCCS relies in its CMS 37 and 64 filings) constitute false records underlying a claim and express false certifications.

## VI. MATERIAL OBLIGATIONS AND REQUIREMENTS OF CONTRACTORS AND SUBCONTRACTORS

### A. MEDICAL NECESSITY, COST EFFECTIVENESS, AND COMPLIANCE WITH FEDERAL AND STATE GUIDELINES, POLICIES AND MANUALS

63. In the contract for which each bidder, including Defendant Health Choice, submitted proposals,  material provisions were included (but were not limited to) each of the following:

(a) All services covered by AHCCCS funds must be medically necessary and cost effective:

> (a) " The Contractor shall provide covered services to AHCCCS members in accordance with all applicable Federal and State laws, regulations and policies, including those listed by reference in attachments and this contract. The services are described in detail in AHCCCS rules R9-22 Article 2, the AHCCCS Medical Policy Manual(AMPM) and the AHCCCS Contractor Operations Manual (ACOM), all of which are incorporated herein by reference, and may be found on the AHCCCS website [42 CFR 438.210(a)(1)]. To be covered, services must be medically necessary and cost effective.

(b) All AHCCCS guidelines, policies and manuals, are incorporated in the Contract:

> All AHCCCS guidelines, policies and manuals, including but not limited to, ACOM, AMPM, Reporting Guides, and Manuals are hereby incorporated by reference into this contract. Guidelines, policies and manuals are available on the AHCCCS website. The Contractor is responsible for complying with all requirements set

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100·Fax (801) 650-0065

forth in these sources as well as with any updates. In addition, linkages to AHCCCS rules, statutes and other resources are available through the AHCCCS website. Upon adoption by AHCCCS, updates will be available on the AHCCCS website.

(c) Contractor compliance with the terms of the contract is a material precondition to payment:

Subject to the availability of funds, AHCCCS shall make payments to the Contractor in accordance with the terms of this contract provided that the Contractor's performance is in compliance with the terms and conditions of this contract.  [Emphasis added]

Section D1: Acute Care Program Contract Requirements

64.  **Utilization management:** The term "utilization management" applies to a contractor's process to evaluate and approve or deny the medical necessity, appropriateness, efficacy and efficiency of health care services, procedures or settings.

65. As set forth in AAC R9-22-522, *Quality Management/Utilization Management (QM/UM) Requirements* (incorporated by reference as a material part of every contract):

A contractor shall comply with Quality Management/Utilization Management (QM/UM) requirements specified in this Section and in contract. The contractor shall ensure compliance with QM/UM requirements that are accomplished through delegation or subcontract with another party.     . . .
B. In addition to any requirements specified in contract, a contractor shall: . . .
        5. Ensure that the QM/UM activities include at least:
        a. Prior authorization for non-emergency or scheduled hospital admissions;
        b. Concurrent review of inpatient hospitalization;
        c. Retrospective review of hospital claims**;**

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

. . .

m. Credentialing a provider network;

66. As set forth in 42 CFR 438.210(b) and AAC R9-22-522, *Quality Management/Utilization Management (QM/UM) Requirements* (incorporated by reference as a material part of every contract):

> (b) Authorization of Services:  The Contractor shall have in place and follow written policies and procedures for the processing of requests for initial and continuing authorizations of services. The Contractor shall have mechanisms in place to ensure consistent application of review criteria for authorization decisions.
>
> 42 CFR 438.210(b)
>
> Contractors must develop and implement a system that includes policies and procedures, coverage criteria and processes for approval of covered services.
>
> 1. Policies and procedures for approval of specified services must:
>
> a. Identify and communicate to providers and members those services that require authorization and the relevant clinical criteria required for authorization decisions. Services not requiring authorization must also be identified.        . . .
>
> b. Delineate the process and criteria for initial authorization of services and/or requests for continuation of services.  . . .
>
> c. Authorize services in a sufficient amount, duration or scope to achieve the purpose for which the services are furnished.
>
> d. Ensure consistent application of review criteria.

67. As set forth in 42 C.F.R. 438.236 and the AHCCCS Medical Policy Manual 1020-7, Clinical Practice Guidelines, which are also to be used for consistent, clinically

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

sound decisions for coverage of services, are a requirement of every managed care contractor:

> 1. Contractors must develop or adopt and disseminate practice guidelines that:
>
>> a. Are based on valid and reliable clinical evidence or a consensus of health care professionals in that field . . .
>>
>> c. Are adopted in consultation with contracting health care professionals and National Practice Standards  . . .
>>
>> f. Provide a basis for consistent decisions for utilization management, member education, coverage of services, and any other areas to which the guidelines apply (42 C.F.R. 438.236).
>
> AHCCCS Medical Policy Manual 1020-7

**B. QUALITY OF CARE -- CREDENTIALING AND NETWORK DEVELOPMENT**

68. In order to assure the competence, quality, training, and practice history of those providers rendering services to Arizona Medicaid beneficiaries on a regular, non-emergency basis, AHCCCS requires a credentialing and contracting process to be utilized for all practitioners seeking to join a contracted plan's panel of providers:

> Services must be rendered by providers that are appropriately licensed or certified, operating within their scope of practice, and registered as an AHCCCS provider. The Contractor shall provide the same standard of care for all members, regardless of the member's eligibility category.
>
> Paragraph 66 --Acute Care/CRS RFP 11/01/2012

69. In order to become a provider for any Arizona Medicaid plan, the provider (e.g. physician, nurse practitioner, etc.) must apply for credentials from the Plan. In order to accomplish this, the provider must submit a standard application form, provide

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

all necessary information on licenses, past performance, credentialing actions, malpractice suits, etc., and execute, after approval from the plan, a contract with the plan. Other than in an emergency, required out-of-state care, and other limited circumstances, a provider may not regularly see patients, be assigned a panel of patients or seek compensation from a health plan (nor may a health plan pay a provider) for services rendered under a Medicaid plan, until these processes, including credentials approval by the plan, have been accomplished.

## C. PROVIDER ENROLLMENT AND PARTICIPATION IN AHCCCS

70. In addition to these requirements, AHCCCS regulations require each individual provider rendering services to Arizona Medicaid recipients (other than in an emergency,  or other limited circumstances) to have an enrollment completed with AHCCCS.

71. The provider enrollment stipulates that each provider, upon rendering services for an Arizona Medicaid beneficiary (whether directly under the fee-for-service program or through a contractor), must certify the following:

> 7. The Provider must comply with all the federal, state and local laws, rules, regulations, policies, standards, and executive orders governing the performance of duties under this Agreement, without limitation to those designated within this Agreement.

> 8. The provider shall comply with all AHCCCS and/or Contractor Provider Manuals and Policy Guidelines, including the AHCCCS Minimum Subcontractor Provisions available at the AHCCCS public web site, and any amendments thereto, all of which are incorporated by reference into this Agreement. The provider has an affirmative obligation to routinely check the AHCCCS website for any revisions or new information and ensure compliance.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

. . .

24. The provider must comply with all the applicable provisions contained in the False Claims Act and as amended by the Federal Fraud Enforcement and Recovery Act of 2009 (FERA). **AHCCCS applies the term "claim" as a request or demand for money or property that is presented to the government, state, contractor, grantee or other recipient, if the money or property is to be spent or used on the government's behalf or to advance the government's interest.**

Arizona Healthcare Cost Containment System
Provider Participation Agreement
[emphasis added]

## D. PROFIT CONTROL MEASURES AND LIMITATIONS

72. Under the AHCCCS, plans including capitated plans such as Health Choice plans, are expected to operate in a cost-efficient manner. Since these plans are capitated and risk-based, the contractor takes the risk of overspending and thus incurring a loss in a plan year. Conversely, if the contractor does not spend all of the capitated payments the plan may keep the profit. However, both losses and profits are limited. Although the AHCCCS transmits the per-member, per-month payment to the plan prospectively, the AHCCCS retains an interest in the funds at reconciliation. If the profit exceeds certain limits above 3%, a portion must be refunded to the State of Arizona (AHCCCS). Above a 6% cumulative profit, all the balances must be returned. As set forth in the *AHCCCS Contractor's Operations Manual, Chapter 300, Section 312*, the following profit or loss limits are set forth:

The reconciliation will limit the Contractor's profits and losses to the percent of net capitation according to the following schedule:

| **Profit** | Contractor Share | State Share | Max Contr.Profit | Cumulative Contr.Profit |
|---|---|---|---|---|
| <= 3% | 100% | 0% | 3.0% | 3% |
| > 3% and <= 5% | 75% | 25% | 1.5% | 4.5% |
| > 5% and <= 7% | 50% | 50% | 1.0% | 5.5% |
| > 7% and <= 9% | 25% | 75% | 0.5% | 6% |
| > 9% | 0% | 100% | 0% | 6% |

| **Loss** | Contractor Share | State Share | Max Contr.Loss | Cumulative Contr.Loss |
|---|---|---|---|---|
| <= 3% | 100% | 0% | 3.0% | 3% |
| > 3% and <= 6% | 50% | 50% | 1.5% | 4.5% |
| > 6% | 0% | 100% | 0% | 4.5% |

**Profits in excess of the percentages set forth above will be recouped by AHCCCS. Losses in excess of the percentages set forth above will be paid to the Contractor.**

[emphasis added].

73. In computing the loss of the profit to be returned to AHCCCS, the Plan subtracts from its total AHCCCS revenue the amounts it paid to a provider for medical services, as well as its own administrative expenses. For example, for calendar year 2013, Plans were allowed to subtract 9.64 percent as administrative expenses. Plans were also allowed to deduct certain other expenses or components.

**VII. IASIS AND HEALTH CHOICE CONTRACTS WITH AHCCCS**

74. Health Choice contracts with state Medicaid programs in Arizona to provide specified health services to qualified Medicaid enrollees through contracted providers. In Arizona, most of its premium revenue is derived through a contract with AHCCCS.

The contract requires Health Choice to arrange for healthcare services for enrolled Medicaid patients in exchange for fixed monthly premiums based upon negotiated per capita member rates and supplemental payments from AHCCCS. Health Choice also contracts with CMS to provide coverage as a Medicare Advantage Prescription Drug ("MAPD") Special Needs Plan (SNP). This contract allows Health Choice to offer Medicare and Part D drug benefit coverage to new and existing dual-eligible members (i.e., those that are eligible for both Medicare and Medicaid).

75. Defendant IASIS, through its Health Choice subsidiaries, contracts with AHCCCS to provide capitated Medicaid coverage to approximately 250,000 Arizona residents. For the single year ending September 2013, Health Choice received capitation premiums of $469,310, 946 and total revenues of $503,604, 936. It recorded earnings before income tax of $30,324, 314.00. For the year ending September 30, 2014, this jumped to total revenue of $620 million of which $578.6 million was from capitation premiums and another $33.68 million from "delivery of supplemental premiums." Health Choice claimed administrative expenses of $61.5 million (compared to just $49.8 million a year earlier) and earnings before income tax of $40,482,969.

76. Under the contract, the Plan subcontracted with hospitals, physicians and other medical providers, including many affiliates of IASIS, within Arizona and surrounding states to provide services to its enrollees in Apache, Coconino, Maricopa, Mohave, Navajo, Pima, Yuma, La Paz and Santa Cruz counties.

77. The Plan's contract with AHCCCS was set to expire September 30, 2013. On March 25, 2013, Health Choice was awarded a new contract by AHCCCS. The new

contract, which covers enrollees in Apache, Coconino, Gila, Maricopa, Mohave, Navajo, Pima and Pinal counties, commenced on October 1, 2013, has an initial term of three years, and includes two-one year renewal options at the discretion of AHCCCS.

## VIII. DEFENDANTS' SCHEMES TO KNOWINGLY AND INTENTIONALLY DEFRAUD AHCCCS

### A.  ANTI-KICKBACK VIOLATIONS: THE "GOLD CARD" SYSTEM OF WAIVERS OF MANDATORY AND REQUIRED PRIOR AUTHORIZATIONS FOR SERVICES

78. Since at least 2011, Defendant Health Choice created and utilized a secret, covert system for providing certain favored providers with a complete waiver of their obligation to obtain any prior authorization for services regardless of whether such authorization requirement was part of Health Choice's published prior authorization grid in effect at the time, or was part of the utilization management plan provided to AHCCCS. This Gold Card status meant that any service that a Gold Card provider wished to provide would not be subject to review, denial, or medical necessity documentation.

79. This status was granted by Health Choice without any relationship to a provider's past record of performance with respect to previous requests or record of adherence to medical necessity standards. It was not based upon any written criteria but was based upon the subjective desire of Health Choice to bring providers into the system and retain them in the system in order to have them available to provide services, obtain referrals, induce referrals, or otherwise influence the provision of items or services for Arizona Medicaid beneficiaries.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

80. This Gold Card status was recorded in the provider's profile with Health Choice's computer systems, and when a Gold Card provider desired to perform a service, it would be "auto approved" in the system. (In other words, the Gold Card status changed the provider from "approval needed" to simple notification of Health Choice that a service was to be provided. This would create a computer record that would allow the bill to be paid on the back end.)

81. The Gold Card status, once granted, also influenced other prior authorization requirements. Specifically, this status flowed to Health Choice's external, contracted prior authorization company for diagnostic imaging,  MSI. Providers Gold Carded by Health Choice also received automatic approval for any requested high-cost, high volume diagnostic imaging procedure regardless of medical necessity under established guidelines.

82. For example, in 2012, Health Choice  approved Gold Card status for two OB/GYN groups. These were and are Defendants, Drs. Goodman & Partridge, LLC, (aka MOMDOC, LLC), and Genesis OB/GYN.

83. On July 16, 2015, MSI (now called EviCore as a result of a merger between MSI and CareCore) presented operational statistics to Health Choice in a quarterly Joint Operations meeting. As part of that meeting, EviCore/MSI presented the following information:

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065



**TOP ORDERING PROVIDERS**

JULY 2014- JUNE 2015

Notes:
1. Rankings are based on total request counts in the most recent 12 months in the reporting period
2. Top ordering providers represent the facilities requests are originating.

84. As is readily seen, the Gold Card provider, "Drs. Goodman and Partridge OB/GYN" (aka MOMDOC) was the top ordering provider, requesting some 6736 imaging studies through EviCore/MSI, with a denial rate of 1%. The second highest ordering provider was the Gold Card provider, "Genesis OB/GYN," requesting some 5354 imaging studies through EviCore/MSI, with a denial rate of less that 1%.

85. By contrast, the largest OB/GYN practice group in the state of Arizona, which was NOT "gold carded," was Arizona OB/GYN Affiliates. This group requested only 2,916 imaging studies (just 43% of those ordered by "Drs. Goodman and Partridge OB/GYN" [aka MOMDOC]), but had a denial rate of 31%.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100·Fax (801) 650-0065

86.  Throughout 2013, 2014 and 2015, the operations personnel at Health Choice sought to expand their Gold Card system to include all providers in their Physicians Group of Arizona.

87. On or about February 10, 2015, the Gold Card status for all Physicians Group of Arizona providers was approved by Casey Osborne, Vice President of Health Choice Preferred ACO.

88. When this was questioned on the following day by Relator Nowak and Relator Gutzwiller, Casey Osborne overrode that concern by stating, "I need a response to this by noon, otherwise I will authorize implementation based upon prior approval and C level approval." Osborne had, the prior day, beseeched Relator Gutzwiller to implement this Gold Card for the Physicians' Group. He stated,

> I need your help to implement. We had medical participate and approve the decision to Gold Card PGA. What do you need from the team to get this implemented? We will be happy to work with your team to get this implemented ASAP.

89. Relator Gutzwiller's attempt to challenge the Gold Card system included specific reference to the potentially fraudulent nature of the system. On February 10th, as previously noted, his email to IASIS stated,

> For both Gold Card request for PGA providers as well as IASIS hospitals, we would need to discuss as this process is not in our UR plan and may look suspicious as it shows as fraudulent practice since we are funded by tax payor money. I have already discussed this with Joe Schaller and he agreed we would need to have this blessed by Compliance before we consider this request.

**Page 33 of 62**

90.  Additionally, relevant Health Choice and IASIS personnel understood that the Gold Card status meant that medical necessity did not need to be demonstrated, and that any Gold Card provider was "auto approved" for any service without preauthorization or substantive medical information being required, in direct violation the AHCCCS requirements and Arizona law and regulation.

91. The Gold Card system permitted the favored providers to order any medical service without documentation or review of cost effectiveness or medical necessity. Services that are not medically necessary or cost-effective are not Medicaid covered services under AHCCCS.

92. The Gold Card system functioned as a kickback of value to the providers in order to entice them to be part of the Health Choice network and   receive network referrals and patients. It also allowed them to refer patients for other services (i.e. referrals to their own ancillary services such as diagnostic imaging) without scrutiny.

90. For example, a complaint of a denial on patient HK was received by Health Choice on or about April 5, 2015. Relator Dr. Cohen denied the request because it did not meet any medical necessity criteria as "there was no documentation of any x-ray reports, no documentation of activity modification or physical therapy."

93. Nonetheless, the PA supervisor, Linda Moseley, noted that she (Dr. Cohen) did not know this claim had been submitted by a Gold Card provider. The email chain further makes it clear that the Gold Card provider is automatically approved and the Medical Director did not have authority to actually deny the authorization.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

94. It was noted by Moseley that Gold Card status meant that the physician was to be treated as auto approved and that the physician had a special relationship with Health Choice entitling him to this preferential treatment. Dr. Cohen, in fact, inquired of IASIS, "Do either of you know about this Dr. Crowder and what this 'special relationship' is all about?" Moseley replied, "He is a Gold Star provider and to be treated as a contracted provider. . ." even though he was not, in fact, contracted.

95. Based upon knowledge and information available to Relators, the Gold Card list of providers who would be auto approved included not less that several thousand individual providers in Arizona. This includes each of the physician groups, physicians, and clinics named as defendants in this complaint.

96. The Gold Card status was also utilized simply to "make a clinic happy" (i.e. as a kickback) and thus stay in network. This was also used to placate a provider with whom Health Choice had problems or difficulties. For example, on March 16, 2015, the following email was sent from Network Services Manager Gail Bullard concerning the Northern Arizona Dermatology Group and Mojave Skin and Cancer.

> I am meeting with this group this week and I think we need to get some issues straight. A Little [sic] over a year ago maybe longer this group and Dr. Daulat we [were] about to term HCA HCG.[1] They were very unhappy. At that time Carol was in Network and she was on the phone with them and Dr. Daulat. She was able to save them by us making them a Gold Card Provider. It went well for some time and now I am hearing grumblings again. Are these 2 Dermatology groups with HCA HCG and HC Essentials as a Gold Card Provider and then do not need PA [Prior authorization] for any of their services.

---

[1] i.e. 'terminate' their participation in Health Choice Arizona and Health Choice Generations.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

97. Similarly, on April 24, 2015, Doug Wiese, the Office Manager for Megan Wiese, M.D., P.C., emailed Gail Bullard, the Health Choice Network representative for Dr. Wiese, as follows:

> Subject: Who Jumped Off the Deep End at HealthChoice?!?
>
> Hi Gail,
> (1) We just got a memo saying HealthChoice is going to start asking for prior auths for all office procedures. That seems kind of crazy – like that time HCA decided to prior auth all IUDs. Does this one look like it's going to stick? **If so, what does our "gold card" status get us?** Are we still going to have to go through the motions and fill out the prior auth for every little biopsy we do?
> (2) **We just had someone in your prior auth department tell us that HealthChoice now wants to see on a tubal consent form that the person obtaining the consent is the same person that does the tubal. That, too, would be a big change and would make a big mess of thing**s. Does this sound right to you or does that person in the prior auth department not know what she is talking about?
> Please let me know your thoughts on these two matters. Thank you in advance.
>
> > Sincerely,
> > Doug Wiese, Office Manager
> > Megan S.K. Wiese, M.D., P.C.
> > [emphasis added]

98. Pursuant to AHCCCS Medical Policy Manual Chapter 400, Exhibit 420-1, the consent for sterilization was always required to be obtained by the physician performing the sterilization.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100·Fax (801) 650-0065

99. By utilizing this preferential system IASIS and its subsidiary plans were able to "buy the loyalty" of providers. This was accomplished by allowing the unfettered and unquestioned flow of cash from Health Choice/IASIS to its own hospitals and favored providers. This flow was unencumbered by prior authorizations or post-payment review. Thus Defendants knowingly, intentionally and fraudulently failed to perform essential utilization review and cost control measures required by Arizona law and their own contracts with AHCCCS.

100. Furthermore, the Gold Card, Platinum, and/or other preferential treatment systems were known and understood both by Defendants IASIS, Health Choice and the Defendant Clinics to be a form of remuneration for the Clinics' participation in the Health Choice network.

101. As an example, during May, 2015, Health Choice, recognizing that it was a knowing and fraudulent practice, began an ostensible appearance of "dismantling" its Gold Card system of preferential treatment with respect to prior authorizations. As part of this initial effort, Relator Hartman, in a conversation with a Senior Director of Operations, discussed sending out a fax to providers about requiring Prior Authorization and acknowledged that significant provider resistance would be encountered. Ms. Cope and Ms. Allis acknowledged that one provider group, with 400 Health Choice members as patients, was terminating its participation with Health Choice because Health Choice was beginning to actually require preauthorization in accordance with the Prior Authorization plan and AHCCCS-approved grid.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

102. During this same conversation, Ms. Cope and Ms. Allis acknowledged that network providers had received value by this Gold Card system. Providers were contacting the network operations personnel complaining that they had neither the time nor staff to actually obtain prior authorizations. Some were requesting a "grant" from Health Choice to the physicians in order for the physicians to hire staff to accomplish this mandatory task. They had avoided this cost and effort for a number of years by being in the Health Choice network.

103. As part of this proposed notification to providers, the network representative for Northern Arizona, Gail Bullard, informed Relator Nowak that a number of providers in her area were bitterly complaining about the prospect of being actually required to obtain pre-authorizations according to the prior authorization grid as approved by AHCCCS. For example, Dr. Michael Valpiani informed Bullard that he simply didn't have the staff to request prior authorizations, and that this was a common complaint.

104. It was observed by Carol Allis (Vice President of Network Services for Health Choice) and Katrina Cope, that Gold Card status, i.e., waiver of prior authorization requirements, had been part of the original arrangement that enticed some physician clinics to agree to be "in network" with Defendant Health Choice. Some of the providers had been in Health Choice's network for a very long time. Concern was expressed that this created another complicating factor since this was part of the verbal, upfront understanding between the clinic and Health Choice. Implied within this

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

discussion by these two executives was the fact that the "kickback" may be contractual in nature.

105. This "admin approval" process would also be used frequently by Health Choice when there was a backlog of claims not meeting AHCCCS's performance standards for timeliness. Frequently, due to deliberate understaffing, Health Choice would be unable to timely process requests for prior authorization. In order to create reports on timeliness for AHCCCS to demonstrate compliance with regulatory and contractual requirements, Health Choice would simply authorize the "admin approval" of delinquent  requests without any attempt to evaluate the requests for medical necessity, consistency of applied criteria or any other required prior authorization process.

106. Upon learning of this scheme, Relator Nowak refused to be complicit in this scheme. On December 9, 2014, Relator Nowak sent the following email concerning the scheme and information she had obtained from Faye Cruz and Linda Moseley:

> Admin approvals
> Nicole Larson, Philip Nieri, David Buskohl,
> John Gutzwiller 12/09/2014   2:49 PM
> Just an FYI: Faye sent out email to admin approve everything that is out of compliance (and there are a significant number that are). We are doing mandatory OT until we are compliant.
>
> I called Faye and asked her if she did send out the email and she stated" we were told in the past that due to when we were out of compliance with our requests in PA we are to admin approve it. This would not be looked at by Medicare or AHCCCS therefore they would not know we were doing it. If it is admin approved they do not look at it because it does not fall onto the list to be audited".

I spoke to Lynda Moseley and she stated the same was a fact and true, they did this every month. They both stated that this was a directive from old management. I informed Faye and Lynda we are no longer following that practice and that we are to review every authorization for accuracy and the email for mandatory OT was sent out. Thank you,

Catherine Nowak RN, BSN, CCM
Interim Director of Utilization Management/
Prior Authorization Medical Services
Health Choice Arizona/Health Choice Generations

**B. KICKBACKS TO PARTICIPATING CLINICS TO UNDERWRITE THEIR COSTS OF OBTAINING PRIOR AUTHORIZATIONS**

107. Beginning in 2013, and continuing through the present time, Health Choice Arizona engaged in a plan and program, using ostensible "partnership for quality outcomes" contracts to fund and provide kickbacks to certain clinics in order to enable them to seek prior authorization for their own claims submitted to Health Choice Arizona. This movement of money to support a core office function of the physician clinic constituted a kickback for all such services between Health Choice Arizona and the subject clinic.

108. For example, on August 13, 2014, Defendant North Country Healthcare, Inc., executed a contract for participation in the "partnership for quality outcomes program" ostensibly part of the Health Choice Generations plan. (Health Choice Generations, as noted above, a Medicare/Medicaid dual eligible special needs program. Its enrollment is limited to beneficiaries with certain diagnoses and who are eligible for

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

both Medicare and Medicaid.) The contract, although executed on August 14, 2014 by North Country's CEO, is stated to be effective October 31, 2013.

109. In the contract not only does Defendant North Country agree to participate in cost control measures and shared participation, Defendant HCA provided a $25,000 up front one-time payment ostensibly to fund a "care coordinator."

110. However, on June 23, 2015, the director of quality management for Health Choice Arizona, Health Choice Generations and Health Choice Utah, raised questions because there appeared to be no tracking or coverage of the "deliverables" for this contract. This director, Monica White, emailed the Network Services Manager for North Country, Gail Bullard, stating:

> Are you tracking the care coordination up at North Country? Do you have set goals in place? My understanding is that we offered $25K to North Country to obtain a care coordinator. Did we put any goals/metrics in place to monitor the success of that program? If so, what are the results – or who is tracking the results?

Ms. Gail Bullard replied:

> Monica: All I did was take the check to North Country. Rob was in contact with them and to be more than honest he did not keep me in the loop at all. On anything [sic]

111. Further, it was clear to the relevant personnel that the real purpose of this was simply to keep North Country in network. The coordination meeting grid from July 2015 states "North Country, a partnership group has a contract in place for case manager located in office to increase comp evals and admission contact."

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

112. The purpose of this "grant" was actually to assist the clinic with core management functions and constituted a kickback in violation of the Anti-Kickback Act. All claims submitted to HCA by North Country from and after the date of this "grant" are false claims.

**C. ANTI-KICKBACK VIOLATIONS: THE "PLATINUM STATUS" SYSTEM TO BYPASS CLAIMS REVIEW; DIRECT PAYMENT OF ANY SUBMITTED CLAIM, AND "ADMINISTRATIVE APPROVAL" OF CLAIMS**

113. In addition to the Gold Card status that is tied to the process of prior authorization, Defendant Health Choice created a further preferential treatment system that allowed certain favored providers to receive unquestioned, un-reviewed and expedited payment of any claim. In this system called the "Platinum" system, claims review was bypassed and claims were directly paid regardless of whether the provider had obtained any prior authorization or had even successfully passed a medical necessity review. In the Platinum system, claims would be automatically paid regardless of any of the preconditions to payment contained in the Health Choice contract with AHCCCS, their utilization plan, or any other preconditions to payment. Any claim sent in would be automatically approved for the amount requested, with payment being made within 10 days. No documentation of the service was required for Platinum status providers.

114. This claims department's ability to override the medical determination of both prior authorization and medical necessity for the claim itself as well as overriding the claims that are intercepted by the audit function, is well known to both the audit function and senior management.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

115.  The computer systems through which claims are processed contains an ability for claims processers to manually "go around and change" both what the audit department and medical review department intercept for the claims. The claims function also has the ability to manipulate claims outside Health Choice's audit department queue so they will never be seen by an auditor.

116. Some providers were Platinum status without being Gold Card status. For these providers, a claim for services in excess of, or different than those for which prior authorization had been approved, would be internally managed within the claims department. The claims processor had at his/her disposal a simple computer check box called "admin approval." By admin approval the claim would be paid as requested.

117. Through this Platinum system and the ability of the claims payment department to manipulate payment auditing and overriding fundamental payment requirements and conditions (such as prior authorization and medical necessity review), Health Choice has materially aided, conspired, and participated in a system in willful disregard of its contractual and regulatory requirements.

118. By way of further example, in June 2015, Dr. Spiess, a Health Choice network provider, filed a complaint with Thomas Betlach (the Director of AHCCCS) about slow payment of his claims. On June 18, 2015, Tida Garcia (Senior Director of Claims Operations) reported to Matthew Kingry (the Health Choice Agency Liaison to AHCCCS) as follows:

Re: Provider Complaint to Director Betlach at AHCCCS

Matthew Kingry

Hello Matthew- per Dr. Spiess's contract, claims have been processed prior to 30 days. Dr. Spiess is considered a "platinum" provider which is an internal process to prioritize claims for adjudication for 7-10 days, Network approved the platinum status to try and satisfy the provider as he is extremely vocal, but please note that is not within the provider's contract. Below are the past 60 days check amounts for Dr. Spiess's office. … Please Please let me know if you have any questions. thank you [sic]

Tida Garcia
Senior Director, Claims Operations
Health Choice, a subsidiary of
IASIS Healthcare

**D. RECKLESS DISREGARD OF TRUTH OR FALSITY OF CLAIMS: CREATION OF FALSE "PRIOR AUTHORIZATION" CODES TO PERMIT PAYMENT OF CLAIMS FOR WHICH REQUIRED PRIOR AUTHORIZATION AND MEDICAL NECESSITY DETERMINATION WAS NOT OBTAINED**

119. In addition to the "Platinum" system, Health Choice created a "place-holder" code to use in the approval block of a claim to force it through the system. This would send checks or funds for transmittal to the provider who had failed to obtain prior approval. The code used was the number 99950, which appeared as the authorization code for a wide range of claims.

120. Health Choice generated a 99950 report in order to track these claims through the process. Because all inpatient admissions (other than emergencies) under

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

Health Choice's contract as approved by AHCCCS required prior authorization, the 99950 code was often used to authorize payment for these inpatient bills.

121. For inpatient care alone, Health Choice conducted an audit which reflected that from 2012 to early 2014, over $7 million of inpatient care (exclusive of any emergency admissions) was paid without prior authorization under these dummy codes. Since that time, the "Inpatient 99950" reports in Health Choice reflect at least an additional $4 million paid without prior authorization.

122. An additional process for non-clinical approval of episodes of care for favored providers was embedded in the computer systems used by Health Choice to document both prior authorizations and payment-related medical necessity and other claims reviews.

123. The approval reason that was available to these personnel was "Admin Approval" as a check box within the system. Its use would automatically render a claim "paid" and allow it to go through the payment system despite any earlier denial of preauthorization or prepayment review by clinical personnel.

124. Those claims paid on a Platinum Status, "99950 Authorization Code," or "Admin Approval" were automatically dropped out of the internal "audit queue" for possible review by the Health Choice audit function and hidden from possible selection for auditors. This resulted in false claims payment accuracy statistics being created by Health Choice for review by AHCCCS, as noted above, and the transmittal to AHCCCS of Encounter Reports (including the described certifications) that contained non-compensable, non-covered services.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

**E. RECKLESS DISREGARD OF MEDICAL NECESSITY: HEALTH CHOICE FAILED AND REFUSED TO APPLY CONSISTENT CRITERIA TO ANY PRIOR AUTHORIZATION MEDICAL DECISIONS**

125. Throughout the course of Defendants' contracts with AHCCCS, Relator Medical Director Risa Cohen attempted to apply standard medical necessity criteria to inpatient and hospital claims submitted to Health Choice by IASIS-owned facilities.

126. However, immediately after the 2013 evaluation, Health Choice cancelled or failed to update all its current, annual update requirements for essential clinical reference tools. These included but were not limited to the Hayes Clinical Guidelines and the InterQual criteria subscription.

127. It also reduced its prior authorization staff, continued to use certain criteria that had not been updated since 2008 (despite representing to AHCCCS that annual updates were performed), and failed to procure current updates to their InterQual criteria being used at the time of the original Complaint in this action. The CEO of Health Choice refused to pay for any updated criteria and refused to pay for fixing interface problems between Health Choice's "Care Radius" system and the InterQual platform itself.

128. However, despite this review by the Medical Director and medical staff, their decisions were routinely overridden and claims paid to IASIS facilities without justification, medical necessity, or other underlying prerequisites for payment.

**F. RECKLESS DISREGARD OF MEDICAL NECESSITY: SPECIAL DISPUTE RESOLUTION PROCESSES FOR IASIS FACILITIES**

129. IASIS facilities submitting claims to Health Choice also did not need to follow regular claims, dispute resolution, or claims appeal processes. Rather, IASIS facilities simply contacted their Network representative to approve payment notwithstanding the proper and correct denial.

130. AHCCCS managed care contractors such as Health Choice have at their disposal a variety of dispute resolution mechanisms other than formal appeal. However, each of these mechanisms must still rely upon consistent medical criteria, be based upon medical necessity, and be supported by documentation to verify the services rendered.

131. Nonetheless, Health Choice established a special "back door" resolution system for IASIS facilities. This system consistently allowed claims to be paid to IASIS facilities in reckless disregard or deliberate ignorance of whether or not those claims met the statutory, regulatory and contractual requirements for covered services.

132. For example, on or about March 9, 2015, a denial of a claim from St. Luke's Medical Center, an IASIS hospital, was questioned by St. Luke's. After extensive investigation the denial was substantiated by utilization review based on unbundling and lack of medical necessity. The response from Health Choice to St. Luke's stated that, "This has been completed by UR to our ability. This will need to go thru the appeals process. There is nothing further we can do with it. Thanks, Dave."

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

133. Yolanda Crudder, a Regional Business Office Director at St. Luke's replied, "David, we are both IASIS owned so we never appeal. Denise, please detail the remaining issue from our perspective and I will discuss with Carol Allis."

134. Carol Allis had no relationship with the utilization review, claims payment, or appeals process as set forth in Health Choice policy, AHCCCS regulations or otherwise. Carol Allis is the Vice President for Network Development for Health Choice Arizona, a position at the corporate level that oversees the sales and contracting with providers.

135. In this case, the amount that St. Luke's claimed they were "short paid" was some $40,000.00. Despite a lesser amount being validated through the utilization review process, Relators are informed and believe that the greater amount was ultimately approved by administrative, non-clinical personnel.

136. Further, it was established knowledge and policy that the member appeals/provider disputes department was not to handle any dispute coming from an IASIS facility. These were instead to be forwarded to the Network Development Office for handling. For example, on March 31, 2015, Karen Coppock, a reviewer in the utilization review claims review department, asked her supervisor,

> I want to make sure that I understand correctly because I get these from time to time and am so used to you presenting the HCA disputes and Beth presenting the HCG disputes. Are all the IASIS hospital disputes handles by our Network Dept.? Does that apply for formal appeals as well?

137. Her supervisor, Clarissa Angel, responded, *"I have always been told that we are not to handle any disputes when it comes from IASIS Facilities [and] to forward*

**Page 48 of 62**

*them to our Network Provider to handle. Now if that has changed I am not aware of it."*
Clarissa Angel further replied, "*I would send them to Mia (Hermania) Villa and CC Tida Garcia but you can confirm that with Tida."*

138. Through at least January of 2015, Tida Garcia was a Director of Network Operations for IASIS healthcare.

139. This process for non-clinical approval of episodes of care for favored providers and use of the "admin approval" would automatically render a claim "paid" and allow it to go through the payment system despite any earlier denial of preauthorization or prepayment review by clinical personnel.

**G. RECKLESS DISREGARD OF MEDICAL QUALIFICATIONS OF ITS PROVIDERS: FAILING TO MAINTAIN AND REQUIRE PROPER CREDENTIALING OF ITS PROVIDER NETWORK**

140. Under Defendants' contract with AHCCCS and pursuant to AAC Title 9 Chapter 22, the Defendants are required to assure that services under Defendants' plans are delivered by providers who have been properly credentialed and meet the quality standards for network providers. Defendants routinely operated a system of backdating the approval dates for providers and approving providers who did not meet minimum quality standards for network participation. Defendants developed and utilized a form within the company for administrative and corporate approval of backdating credentials.

141. For example, in a meeting held May 3, 2015, in which one of the participants was a Vice President of Operations, the executive leadership refused to eliminate the policy of backdating. Attendees further discussed Dr. Rob Schuster, an

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

abdominal surgeon in Phoenix, Arizona, who provided services on a routine basis for several years when he was never credentialed in the system. Another physician had no credentials but saw network patients for 2,296 days without being credentialed.

142. It was further recognized at this meeting that backdating was not simply an error but was an intentional system. Defendants' executive leadership in attendance at this meeting discussed that backdating had been occurring for 13 years and for some non-credentialed providers, the "single case agreement" was routinely used to circumvent the credentialing process.

143. Executive leadership in attendance at this meeting, after inquiry by others including Relator Cohen, refused to consider a self-disclosure about the process and instead discussed a way to create a "work around" in the computer systems that would mask the wrongdoing from any auditor. Specifically, it was discussed that this risk existed in the event of an audit and how to circumvent discovery.

144. Further discussion included the fact that many providers were credentialed in the northern four counties (rural) of Arizona who would not meet quality standards in Maricopa County.

145. Another material violation of its contractual and statutory obligations under Arizona Medicaid concerns the untimely processing and practice of backdating provider contracts and Defendants' credentialing actions. This activity intentionally masked and obscured the fact that, in a number of cases, Arizona Medicaid patients were being seen by and treated by providers who were neither under contract to Health Choice nor had been properly credentialed to see Medicaid patients. The backdating of

these contracts and credentialing actions was a well-known and accepted part of Defendants' policies and procedures. This backdating further served to provide false and misleading statistics on Health Choice's timeliness for credentialing, which was a required performance metric under their AHCCCS contract.

146. The backdating of both provider contracts and credentialing actions resulted in the use (often for protracted periods) of providers for whom necessary quality reviews had not been performed.

147. A review by Health Choice undertaken in early August 2015 reflected the fact that, during a three-month period in the spring of 2015, 4,196 providers had submitted claims to Health Choice in excess of $1000 for services rendered (not including emergencies, true single-case agreements, or out-of-state care). Some 1,747 of these providers had no credentialing action whatsoever in the Health Choice system. These are providers for whom Health Choice had never undertaken credentialing action (i.e. had never bothered to apply for credentialing by Health Choice) yet were regularly and routinely seeing Health Choice members. Thus, Health Choice had been paying a large number of providers for whom they had no credentialing action whatsoever.

## IX. BOTH HEALTH CHOICE AND IASIS HAVE ACTUAL KNOWLEDGE OF THEIR FAILURE TO PERFORM MATERIAL REQUIREMENTS OF ITS CONTRACT WITH AHCCCS

148. Throughout the period of the AHCCCS contract and continuing to the present time, Health Choice Arizona and all Health Choice defendants have actual knowledge of their knowing and material failures to comply with their contractual and

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

regulatory obligations. Defendants have actual knowledge of the failure to perform required and timely credentialing activities, actual knowledge of the existence of complete breakdowns in the medical necessity–prior authorization functions, and other material functions.

149. As part of its bidding for the contract, Defendant Health Choice Arizona submitted documentation and made extensive representations all intended to secure the desired contract with AHCCCS. Each of the following representations was false at the time it was made, known by Health Choice to be false at the time it was made, and was intended by Health Choice to be materially relied upon by AHCCCS.

150. As specifically discussed elsewhere in this Complaint, each of the following representations made by Health Choice directly in connection with its bid for a contract with AHCCCS was materially false and knowingly failed and omitted to state crucial information necessary to make the statements not misleading.  These representations included:

> • Continual evaluation of prior authorization grid: Based on provider feedback, we continually revise the prior authorization grid. In 2012, we eliminated nearly 50% of the existing requirements. **We offer "gold card" status to physicians with a proven history of following evidence-based guidelines, allowing exceptions to certain authorization requirements and reducing "hassle factor" for high quality physicians. . . .** Improvements to reduce the provider "hassle factor," including efforts to enhance the claims processing system, resolve disputes and settle cases to reduce the need for costly administrative hearings. (Question 9).
>
> > HCA RFP Submission  p.32 [emphasis added]
>
> We simply do what we say we are going to do. **This means paying providers accurately and timely for quality, medically appropriate**

**care without burdensome administrative requirements, and providing innovative evidence-based decision-support tools and hands-on care coordination to enhance patient-centered care.**

HCA RFP Submission pp. 34-35
[emphasis added]

151. Each of these representations was false at the time it was made by Health Choice and was known by Health Choice to be false. Each such statement was also false by reason of deliberately and intentionally omitting information necessary to make the statements not misleading.

152. The statements made were intended to convey to AHCCCS a false and fraudulent description of its "Gold Card" system and its selective use of that system as a kickback to select providers and IASIS controlled providers. Its representations further were intended to misrepresent its fraudulent concealment of non-compliance with its timely processing of prior authorization requests, timely payment of claims requirements, and failure to require proper credentialing and contracting of its routinely used providers.  Its representation was further designed to fraudulently hide from AHCCCS its complete lack of evidence-based decision support tools as required by both regulation and contract.

153. In addition, Health Choice was fully aware of its complete failures in these regards as a result of its own auditing process.

154. For example, in auditing the prior authorization function, an auditor within the Compliance Audit Department routinely audits the accuracy and timeliness of both procedural and substantive prior authorization functions and criteria. These include but

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

are not limited to turn-around time, propriety of information,  documentation to support the decisions to approve or deny, and similar functions.

155. Throughout March and April of 2015, the best any of these audits did was a 69% passing rate. The proper completion rate for each other week during this entire time span was no better than 50% with a low of 40%. During the week of May 20, 2015, a prior authorization audit of Health Choice Generations reflected a score of only 62% correct, and on May 26, 2015, the audit found only 62% correct.

156. Despite these audit results, which Relators are informed and believe are typical for the entire Health Choice auditing process stretching back at least several years, no affirmative action was taken to improve the prior authorization and utilization management functions. In fact, during that time, and based upon Relators' personal knowledge, Defendant Health Choice reduced its prior authorization staff by at least four employees, and cut its number of medical directors from three to one.

157. As previously discussed, Defendants' executive leadership, including the Vice President of Compliance, were in attendance at a meeting on April 21, 2015, to discuss fraudulent credentials/contracts backdating that had been occurring for 13 years and the "single case agreement" which was routinely used to circumvent the credentialing process. Specifically, it was discussed that this risk existed in the event of an audit and how to circumvent discovery.

158. In addition, the entire system of "Gold Card" for IASIS facilities and redirecting patients from other physicians to IASIS providers was, and is, carried out in furtherance of IASIS' strategic plans. In the IASIS FY 2013 Strategic Plan for Health

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

Choice, IASIS stated as a key strategy to "Provide Managed Care Infrastructure to Support IASIS Facilities and PGs" (Physician Groups). As an Objective, the Plan stated: "Drive appropriate volume to IASIS facilities."

159.  In furtherance of the IASIS revenue objectives, IASIS and Health Choice collaborated to transfer, immediately upon receipt from AHCCCS, the vast majority of monthly or periodic payments from AHCCCS directly to cash accounts of the parent, IASIS. The Fiscal Year 2014 Health Choice Audit (by Ernst & Young) noted an item labeled "Due From Affiliates" in the sum of over $288 million ($288,423,152) . The audit's description of this item stated:

Summary of Significant Accounting Policies

Due from affiliates mostly represents the net excess of funds transferred to the centralized cash management account of lASIS over funds transferred to or paid on behalf of the Plan. Due from affiliates balances are readily available to the Plan for settlement of the Plan's current liabilities as they become duc. Generally, this balance is decreased by automatic cash transfers from the lAStS accounts to the Plan's bank accounts to pay certain expenses. Generally, **the balance is increased through transfers of daily cash deposits from the Plan's bank accounts to the centralized cash management account of IASIS.** Interest income is not earned on outstanding balances due from affiliates. [emphasis added].

160. Thus, the payments to Health Choice from AHCCCS immediately and daily simply became working capital for IASIS until actually needed for payment of a claim. As a result, Health Choice was operated as a mere operating division of IASIS, not as a

true separate corporate identity. IASIS was fully financially integrated, operationally integrated, and functioned with full and complete control over, and knowledge of, Health Choice's operations. IASIS is thus liable for all wrongful conduct undertaken by Defendant Health Choice.

161. Thus, defendants, their executive leadership and senior managers are all fully aware of the fraudulent conduct described herein and have knowingly and intentionally allowed it to exist throughout the time periods alleged herein and up to the present time.

## X. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF – 31 U.S.C. § 3729(A)(1)(A)

### (Against All Defendants)

162. Relators incorporate by reference all preceding paragraphs of this Complaint as though the same were set forth herein at length.

163. Defendants knowingly, in reckless disregard and/or in deliberate ignorance of the truth or falsity of the claims, presented false and fraudulent claims for payment for services provided to patients insured by federally-funded health insurance programs,

164. When they submitted claims for reimbursement from Medicaid funds to AHCCCS, Defendants both expressly and impliedly certified to AHCCCS and, indirectly, CMS, that the claims were submitted in compliance with Medicare and Medicaid laws, rules and regulations, despite Defendants' violations of the Medicare Anti-kickback Law.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

165. Said claims and certifications were false at the time they were made. Defendants Health Choice of Arizona, Inc., had offered and provided remuneration, directly or indirectly, overtly or covertly, in cash or in kind to other Defendants in order to induce such persons to order or arrange for referrals for services or to purchase, order, or arrange for or recommend purchasing, or ordering goods, services, or items for which payment may be made in whole or in part under a Federal health care program, i.e. the Arizona Medicaid program and the Medicare – Medicaid Dual Eligible SNP program (Health Choice Generations). Defendants Physician Group Of Arizona, Inc., St. Luke's Behavioral Hospital, LP, St. Luke's Medical Center, LP, Mountain Vista Medical Center, LP, Heritage Technologies LLC, and Northern Arizona Dermatology Center, PC, North Country Healthcare Inc., MOMDOC, LLC, Drs. Goodman & Partridge, LLC, and Genesis OBGYN, all accepted and received such remuneration directly or indirectly, overtly or covertly, in cash or in kind to provide, induce, or arrange for referrals for services under a Federal health care program.

166. All of the representations and certifications, both express and implied, contained with respect to each bill to AHCCCS and CMS, had a natural tendency to influence Medicare's and AHCCCS's decision whether to consider the claim a covered service and thus pay the claim, and was material to the payment of the claim. All claims submitted to by said Defendants to Defendants Health Choice Arizona, and included in services for which Defendant health Choice sought reimbursement (directly or indirectly) from and after the offer and receipt of such remuneration constitute false claims.

167. As a result of these schemes, Defendants caused Medicare, Medicaid (administered in Arizona by AHCCCS) and the other government payors to incur significant damage and those damages are continuing to accrue.

### SECOND CLAIM FOR RELIEF – 31 U.S.C. § 3729(a)(1)(B)

**(Against Defendants IASIS, Health Choice of Arizona, Inc., Health Choice Management Co., Inc., Physician Group Of Arizona, Inc., St. Luke's Behavioral Hospital, LP, St. Luke's Medical Center, LP,  Mountain Vista Medical Center, LP, Heritage Technologies LLC)**

168. Relators incorporate by reference all preceding paragraphs of this Complaint as though the same were set forth herein at length.

169. Defendants knowingly, in reckless disregard and/or in deliberate ignorance of the truth, made, used and/or caused to be made or used, false records and statements material to a false and fraudulent claim to obtain approval and payment from the Government when they submitted claims for funds to AHCCCS.

170. AHCCCS, CMS and other federal health care program administrators, unaware of the falsity of the claims and statements made or caused to be made by the Defendants, and in reliance on the accuracy of these claims and statements, paid for these services through the Contracts between AHCCCS and Defendants.

171. All of the representations and certifications both express and implied, contained with respect to each bill to AHCCCS, CMS and other federal health care program administrators, had a natural tendency to influence their decision whether to pay the claim and were material to the payment of the claim.

172. As a result of these false and fraudulent records and statements, Defendants caused Medicare, Medicaid (administered in Arizona by AHCCCS) and the other

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100·Fax (801) 650-0065

government payors to incur significant damage and those damages are continuing to accrue.

## THIRD CLAIM FOR RELIEF – 31 U.S.C. 3729(a)(1)(C)

### (Against All Defendants)

173. Relators incorporate by reference all preceding paragraphs of this Complaint as though the same were set forth herein at length.

174. Defendants knowingly, in reckless disregard and/or in deliberate ignorance of the truth, conspired between themselves to present and/or cause to be presented false and fraudulent claims for payment and approval for services delivered or purported to be delivered to patients insured by federally-funded health insurance programs. These included claims for services derived from violations of the Anti-kickback laws, and claims for reimbursement or funds based upon payments and records that were knowingly and deliberately false or were made in reckless disregard or deliberate ignorance of whether they were true or false. These included but were not limited to express and implied certifications that the services were medically necessary, cost effective, and otherwise covered under the Medicare program and delivered in compliance with applicable regulations and contract terms.

175. AHCCCS, CMS and other federal health care program administrators, unaware of the falsity of the claims and statements made or caused to be made by the Defendants, and in reliance on the accuracy of these claims and statements,  continued throughout the contracts to pay the Defendants.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

176. All of the representations and certifications, both express and implied, contained with respect to each funding request, and other similar document to AHCCCS, CMS and other federal health care program administrators, had a natural tendency to influence the decision whether to pay the claim and were material to the payment of the claim.

177. As a result of the conspiracy, Defendants caused AHCCCS, CMS and other federal health care program administrators, to incur significant damage and those damages are continuing to accrue.

## FOURTH CLAIM FOR RELIEF – 31 U.S.C. 3729

### (Against Defendants IASIS, Health Choice of Arizona, Inc., and Health Choice Management Co., Inc.)

178. Relators incorporate by reference all preceding paragraphs of this Complaint as though the same were set forth herein at length.

179. Defendants submitted enrollment applications, reports , and other quarterly and annual financial and performance reports which contained false implied certifications, causing the State of Arizona to submit forms CMS-37 and CMS-64, which contained express false certifications to the federal government, falsely certifying that Defendants were in compliance with their obligations as described herein.

180. All of the representations and certifications, both express and implied, contained with respect to each funding request, reports, and other quarterly and annual financial and performance reports, and other similar documents were known by Defendants to be relied upon by AHCCCS and would lead CMS and other federal health care program administrators to transmit FFP funds to AHCCCS for prohibited

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065

services. Each such representation had a natural tendency to influence the decision whether to pay the claim and were material to the payment of the claim.

181. As a result of the conspiracy, Defendants caused AHCCCS, CMS and other federal health care program administrators, to incur significant damage and those damages are continuing to accrue.

## XI. PRAYER FOR RELIEF

182. WHEREFORE, Plaintiff/Relator, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against each Defendant, jointly and severally, as follows:

A. The amount of the United States' damages in an amount to be proven at trial, including but not limited to the full amount paid to any defendant under each contract obtained by fraud;

B. Treble the amount of the United States' damages to be proven at trial;

C. Civil penalties in the maximum amount allowed by the False Claims Act, for each false claim submitted, especially in view of the fact that the Defendants' fraud is so egregious as to justify debarment from all Federal health care programs;

D. Reasonable costs and attorney's fees;

E. The maximum allowed to Relators under 31 U.S.C. § 3730(d);

F. Trial by jury as to the allegations against each Defendant; and

G. Such other and further relief as this Court deems to be just and proper.

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100 · Fax (801) 650-0065

## XII. DEMAND FOR TRIAL BY JURY

183. Pursuant to Rule 38, Federal Rules of Civil Procedure, a jury trial is demanded.

Dated:  May 12, 2016

Respectfully submitted,

By:____/s/_____
Robert D. Sherlock (Utah Bar No. 02942)
(admitted  *pro hac vice*)
**EISENBERG, GILCHRIST & CUTT**
215 South State Street, Suite 900
Salt Lake City, Utah 84111
Telephone: (801) 366-9100
rsherlock@egclegal.com

Eisenberg Gilchrist & Cutt
215 South State Street, Suite 900
Salt Lake City, Utah 84111
(801) 366-9100· Fax (801) 650-0065