**WO**                          NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, *ex rel.* Aaron Fisher, *et al.*, | No. CV-15-00872-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| IASIS Healthcare LLC, *et al.*, | |
| Defendants. | |

At issue is Certain Defendants'[1] Motion to Dismiss (Doc. 78, Mot.), to which Plaintiff Relators[2] have filed a Response (Doc. 95, Resp.), and Moving Defendants Replied (Doc. 105, Reply). Multiple parties[3] joined in both the Motion to Dismiss and Reply. (Docs. 83, 88, 89, 90, 106, 107, 108.) Both sides also submitted supplemental authority in support of their respective filings. (Docs. 84, 102.) The Court finds this matter appropriate for decision without oral argument. *See* LRCiv 7.2(f).

---

[1] Defendants IASIS Healthcare LLC ("IASIS"), Health Choice of Arizona, Inc. ("Health Choice"), Health Choice Management Co. ("HCMC"), Physician Group of Arizona ("PGA"), St. Luke's Behavioral Hospital, L.P. ("SLBH"), St. Luke's Medical Center L.P. ("SLMC"), Mountain Vista Medical Center, L.P. ("Mountain Vista"), and Heritage Technologies, LLC (collectively, the "Moving Defendants").

[2] Aaron Fisher, Risa Cohen, John Gutzwiller, Deborah Hartman, Cynthia Limon, and Catherine Nowak (collectively, "Relators").

[3] Northern Arizona Dermatology Center P.C., North Country Healthcare Inc., MOMDOC LLC, and Genesis OB/GYN, P.C. (which filed an additional Motion to Dismiss (Doc. 90) which also joins in the Moving Defendants' Motion) (collectively, "Joining Defendants").

## I.      BACKGROUND

Pursuant to the False Claims Act ("FCA"), private persons known as "relators" may file *qui tam* actions and recover damages on behalf of the United States. 31 U.S.C. § 3730(b). Relators here are healthcare professionals currently or formerly employed by one of the Health Choice entities. Relators originally filed this FCA action on May 14, 2015 on behalf of the United States. (Doc. 1.) Relators filed a First Amended Complaint, as of right, on July 22, 2015 (Doc. 7) and a Second Amended Complaint on January 28, 2016 (Doc. 14). In accordance with the FCA's *qui tam* provisions, the Complaint remained under seal until the United States determined whether they would intervene and proceed with the case as co-Plaintiff—which they declined to do. Moving Defendants met and conferred with Relators, who then filed the Third Amended Complaint, the operative pleading, on May 23, 2016. (Doc. 67, TAC.) The Relators assert four claims under three subsections of the FCA—31 U.S.C. §§ 3729 (a)(1)(A)-(C).

The Court accepts as true the following allegations for the purpose of resolving this Rule 12(b)(6) Motion. *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 338 (9th Cir. 1996). The Centers for Medicare & Medicaid Services ("CMS") oversee Medicaid—which provides healthcare services for low-income and disabled individuals and is jointly funded by the federal government and the states, and is administered on a state-by-state basis. 42 U.S.C. § 1396, *et seq.* IASIS Healthcare LLC ("IASIS") is a hospital management company that owns or leases at least 17 healthcare facilities. Health Choice Arizona ("Health Choice"), a wholly owned subsidiary of IASIS, is a prepaid Medicaid-managed health plan that contracts with Arizona Health Care Cost Containment System ("AHCCCS"), the state agency that administers Arizona's Medicaid program pursuant to a Section 1115 waiver that permits states to enact certain pilot projects in their Medicaid programs. 42 U.S.C. § 1315. Health Choice provides healthcare services to Medicaid enrollees through subcontracted providers. Unlike a traditional fee-for-service model, under a managed care program, the managed care organizations ("MCOs") enter into comprehensive risk contracts with the state. *See* 42 U.S.C. § 1396b(m) (defining MCOs);

42 C.F.R. § 438.1(a) (rules regarding MCOs and state contracts). Under a risk contract, the MCO is paid a "capitation payment," and in return assumes risk for the costs of the services covered under the contract. 42 C.F.R. § 438.2 (defining risk contract). Here, Health Choice provides insurance to Medicaid beneficiaries on a capitated per-member, per-month payment from AHCCCS. Health Choice experiences a loss when it pays more for medical care than it receives in capitation payments, and earns a profit when it pays out less. Health Choice's contract with AHCCCS requires all funds to be medically necessary and cost effective, and incorporates various regulations and policies by reference. 42 C.F.R. § 438.210(a)(1).

As an MCO, Health Choice mandatorily provides AHCCCS with ongoing reports, known as Encounter Data Reports, that record all Medicaid-covered services reported on an inpatient or outpatient claim submitted to an MCO, including those paid, administratively denied, or for which no Medicaid payment was due. Health Choice's Chief Financial Officer or Chief Executive Officer, or another individual designated to sign on their behalf, is also required to report contractor encounter data under 42 C.F.R. §§ 438.604 and 438.6087. This report must include an attestation that the data or documents recorded and submitted are based on best knowledge, information, and belief, are in compliance with Subpart H of the Balanced Budget Act requirements, are complete, accurate, and truthful, and are in accordance with all federal and state laws, regulations, policies, and contracts. In order to receive federal funds, each state must submit a quarterly estimate to the United States for estimated costs, including MCO services (Form CMS-37), and a quarterly expenditure report (Form CMS-64). Both the CMS-37 and CMS-64 include a certification attesting that the reported data include only allowable expenditures "in accordance with applicable federal, state, and local statutes, regulations, policies, and the state plan approved by the Secretary . . ." Relators allege that Health Choice's encounter reports are directly incorporated into the State's CMS-37 and CMS-64 reports.

To deliver services, each MCO is required to develop a network of sub-contracted providers consisting of physicians, hospitals, clinics, medical equipment suppliers, and other entities necessary to deliver care. Each subcontractor agrees to deliver services based on the negotiated payment rates. Despite these subcontracts, the MCO remains fully responsible for the aspects of contract performance, agreeing to assure that all activities carried out by its subcontractors conform to its duties.

From 2011 on, Health Choice operated a program in which certain providers were granted "Gold Card" status as an apparent provider retention measure and to entice other providers to join the Health Choice network. Gold Card status was granted, apparently, without regard to the performance of the provider or demonstrated ability to provide medically necessary and cost effective care. Once recorded in the provider's computer profile, Gold Card status granted automatic approval for any service payments requested by that provider without prior authorization review. When they became aware of the program, Relators Nowak and Gutzwiller each raised concerns regarding the Gold Card system's compliance with applicable statutes and regulations. Relators provide at least one example of a provider's request being denied due to lack of documentation of x-ray reports, activity modification, or physical therapy that was immediately approved once it was determined that the provider was a Gold Card member. Relators allege that each physician, physician group, or clinic named in the TAC was a Gold Card provider.

Health Choice also created a similar provider retention measure known as "Platinum status," under which a provider's claims bypassed the review process and were automatically paid within ten days—without documentation and regardless of whether the provider had obtained any prior authorization or had passed a medical necessity review. Relators allege that such claims were manually approved and manipulated within the system so as to circumvent the medical review and audit departments.

Relators also allege that Health Choice was improperly staffed, which led to its inability to timely process requests for prior authorization in violation of AHCCCS's performance standards. To alleviate the backlog caused by such staffing issues and

comply with its contractual and regulatory requirements (or create the appearance of compliance), Health Choice would "admin. approve" the delinquent requests without evaluating the claims for necessity, consistency, or other prior authorization requirements. Such approval also ignored any previous denial due to preauthorization review.

Health Choice similarly created a "place-holder" code—99950—to approve blocks of claims. Like the Platinum status claims and those marked admin. approve, 99950 claims were automatically dropped out of the internal audit queue for possible review by Health Choice and approved *en masse*, resulting in the creation of incorrect accuracy statistics and encounter reports that contained non-compliant, non-covered services for transmission to AHCCCS.

During the relevant time period, Health Choice also applied a different appeals and utilization review process for IASIS-owned facilities. Through these programs, administrators would override Health Choice's medical personnel's denial of claims if submitted by IASIS-affiliated providers.

Beginning in 2013, Health Choice also created a program entitled "partnership for quality outcomes." Through this program, providers were given funds purportedly to shift administrative burden, particularly with regard to prior authorization. For example, Defendant North Country Healthcare Inc. ("North Country") contracted with Health Choice as part of the partnership program. In doing so, North Country agreed to participate in non-specific cost control measures. In return, Health Choice provided a $25,000 payment to fund a care coordinator to facilitate implementation of those measures. Health Choice failed to ensure that a care coordinator was hired or that any other measurable was tracked with regard to the grant or use of funds.

Relators also allege that Moving Defendants failed to properly credential providers in its network, paid claims submitted by uncredentialed providers, and routinely operated a system of intentional backdating of approval dates for providers and approving providers who did not meet minimum quality standards for network participation.

## II.      LEGAL STANDARD

### A.      Pleading Requirements

Federal Rule of Civil Procedure 12(b)(6) is designed to "test[] the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). When analyzing a complaint for failure to state a claim for relief under Rule 12(b)(6), the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). Legal conclusions couched as factual allegations are not entitled to the assumption of truth, *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009), and therefore are insufficient to defeat a motion to dismiss for failure to state a claim. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). Generally, on a Rule 12(b)(6) motion, Federal Rule of Civil Procedure 8(a) governs and requires that a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Here, however, the Ninth Circuit has held that "[t]he heightened pleading standard [Federal Rule of Civil Procedure] 9(b) governs FCA claims." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011). "Rule 9(b) provides that in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Id.* (internal quotation omitted). Where a plaintiff alleges fraud or misrepresentation, Rule 9(b) imposes heightened pleading requirements. Specifically, "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation omitted); *see also Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (allegations must contain "an account of time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations"). The heightened pleading requirements of Rule 9(b) apply even where "fraud is not a necessary element of a claim." *Vess*, 317 F.3d at 1106. So long as a plaintiff alleges a claim that "sounds in fraud" or is "grounded in fraud," Rule 9(b) applies. *Id.* Rule 9(b)'s particularity requirement serves many purposes. It "give[s] notice to defendants of the

specific fraudulent conduct against which they must defend," "deter[s] the filing of complaints as a pretext for discovery of unknown wrongs," and "prohibits plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001).

### B.    False Claims Act

The FCA, 31 U.S.C. §§ 3729 *et seq.*, provides for "the recovery of civil penalties from those who knowingly present a false or fraudulent claim to the federal government for payment, or knowingly use a false record to avoid or decrease an obligation to pay the federal government." *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1467 n.1 (9th Cir. 1996). Originally enacted to punish and prevent massive frauds perpetrated by large contractors during the Civil War, the FCA's chief goal was to provide for restitution to the government of money taken from it by fraud. *See United States v. Bornstein*, 423 U.S. 303, 309 (1976). The Supreme Court has refused to adopt a restrictive reading of the statute, however, holding that the FCA is a "remedial statute [that] reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert–White Co.*, 390 U.S. 228, 233 (1968); *United States v. McLeod*, 721 F.2d 282, 284–85 (9th Cir. 1983).

The FCA authorizes individuals, known as "relators," to file civil suits, referred to as "*qui tam* actions," against persons who present false claims to the government. 31 U.S.C. § 3730. It makes liable any person who has (1) knowingly presented or caused to be presented a false or fraudulent claim; (2) knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid; or (3) conspired to defraud the government by getting a false or fraudulent claim paid. 31 U.S.C. § 3729(a)(1)-(3). The FCA defines "knowing" as having actual knowledge of information, or acting in either deliberate ignorance or reckless disregard of the information's truth or falsity. 31 U.S.C. § 3729(b). Congress amended the FCA to include this definition to make "'firm . . . its intention that the act not punish honest mistakes or

incorrect claims submitted through mere negligence.'" *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998) (quoting S. Rep. No. 99–345 at 7 (1986), 1986 U.S.C.C.A.N. 5266, 5272); *see also Hagood*, 929 F.2d at 1421 ("the statutory definition of 'knowingly' requires at least 'deliberate ignorance' or 'reckless disregard'"). Thus, "[t]he phrase 'known to be false' . . . means [known to be] 'a lie.'" *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992) (quoting *U.S. ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir. 1990) (*overruled on other grounds by U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121 (9th Cir. 2015)). "The FCA does not define false. Rather, courts decide whether a claim is false or fraudulent by determining whether a defendant's representations are accurate in light of applicable law." *United States v. Bourseau*, 531 F.3d 1159, 1170–71 (9th Cir. 2008).

Accordingly, "[a] civil action for False Claims Act liability requires four essential elements: '(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due.'" *United States ex rel. Ruhe v. Masimo Corp.*, 977 F. Supp. 2d 981, 991 (C.D. Cal. 2013) (quoting *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006)); *see also Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 997 (9th Cir. 2010). A plaintiff "must show an actual false claim for payment being made to the Government"; "[e]vidence of an actual false claim is the *sine qua non* of a False Claims Act violation." *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002); *see also Cafasso* 637 F.3d at 1055 ("It seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim. . . . [T]he [FCA] attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment'"); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266–67 (9th Cir. 1996) ("Violations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a

government benefit . . . . [Thus there is no FCA liability] where regulatory compliance was not a *sine qua non* of receipt of state funding").

There are several theories of FCA liability. "The prototypical false claims action alleges a factually false claim, *i.e.*, an explicit lie in a claim for payment, such as an overstatement of the amount due." *U.S. ex rel. Modglin v. DJO Global Inc.*, 48 F. Supp. 3d 1362, 1387 (C.D. Cal. 2014). Relators relying on a false certification theory allege that the defendant's claim is false because the defendant certified to a government agency that it had complied with laws, rules, or regulations governing the reimbursement of claims or other provision of benefits when it had not. There are two types of false certification claims—expressly false certification and impliedly false certification.

"Express certification simply means that the entity seeking payment certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted. Implied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." *Ebeid*, 616 F.3d at 998.

To show that claims were false under a false certification theory, a complaint "must plead with particularity allegations that provide a reasonable basis to infer that (1) the defendant explicitly undertook to comply with a law, rule or regulations that is implicated in submitting a claim for payment and that (2) claims were submitted (3) even though the defendant was not in compliance with that law, rule or regulation." *Id.*

In addition to the false certification theory of liability, the Ninth Circuit has recognized FCA liability based on promissory fraud or "fraud-in-the-inducement." Under this theory, no false statement regarding compliance with government regulations is needed, but rather, "liability will attach to each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct." *Hendow*, 461 F.3d at 1173. The Ninth

1    Circuit has noted that this theory is "not so different from the false certification theory,

2    and even requires the same elements." *Id.* at 1174.

3        A relator relying on these theories in an FCA action does not have to identify

4    representative examples of false claims to support every allegation. *Id.* The use of

5    representative examples is "simply one means of meeting the pleading obligation." *Id.*

6    Under Rule 9(b), "it is sufficient to allege 'particular details of a scheme to submit false

7    claims paired with reliable indicia that lead to a strong inference that claims were actually

8    submitted.'" *Ebeid*, 616 F.3d at 998–99 (quoting *United States ex rel. Grubbs v.*

9    *Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

10       "Because a dismissal of a complaint or claim grounded in fraud for failure to

11   comply with Rule 9(b) has the same consequence as a dismissal under Rule 12(b)(6),

12   dismissals under the two rules are treated in the same manner." *Vess*, 317 F.3d at 1107.

13   **III.   ANALYSIS**

14       **A.    Claims Based on Anti-Kickback Statute Violations**

15       Count I of the TAC asserts FCA claims in violation of 31 U.S.C. § 3729(a)(1)(A)

16   through the submission of claims rendered false due to untrue certifications of

17   compliance with the Medicare and Medicaid Patient Protection Act, also known as the

18   Anti-Kickback Statute ("AKS"). 42 U.S.C. §§ 1320(a)-7b(b). The AKS prohibits any

19   person or entity from "knowingly and willfully offering to pay remuneration to another to

20   induce them to purchase, lease, order, or arrange for or recommending purchasing,

21   leasing, or ordering any good, facility, service, or item for which payment may be made

22   in whole or in part under a Federal health care program." 42 U.S.C. §§ 1320a-

23   7b(b)(2)(B). The Patient Protection and Affordable Care Act made any "claim that

24   includes items or services resulting from a violation of [the AKS] . . . a false or fraudulent

25   claim for the purposes of [the FCA]." 42 U.S.C. §§ 1320a-7b(g).

26       **1.    Gold Card, Platinum Status, and Preferential Programs**

27       Moving Defendants move to dismiss Count I on the grounds that Relators have

28   failed to allege that remuneration to providers was for referrals or resulted in any

purchases or referrals. (Mot. at 9-11.) Moving Defendants also contend that the TAC fails to allege what Platinum status benefits were induced, what purchases resulted, or the intent to induce either. (Mot. at 12.) However, Moving Defendants' overarching contention is that Health Choice, as an MCO, receives capitation payments from AHCCCS based on the headcount of plan enrollees, not on particular services provided, and is not, by its very nature, susceptible to kickback programs that function as the preferential systems alleged here. (Mot. at 9-14.)

In the TAC, Relators allege that Health Choice's Gold Card, Platinum status, and other preferential programs created kickbacks by allowing providers' claims to avoid prior authorization review, regardless of whether they were documented as medically necessary or complied with Health Choice's published prior authorization requirements or utilization management plan with AHCCCS. (TAC ¶ 78.)  According to Relators, Gold Card status was granted to providers without consideration of past performance or a record of adherence to medical necessity standards. (TAC ¶ 79.)  Instead, Relators allege, the sole reason to grant Gold Card status was to entice providers to join or remain in Health Choice's network, rendering such alleged remuneration a kickback under the AKS. (TAC ¶ 92.) Relators allege that these programs were understood by IASIS, Health Choice, and Provider Defendants to be remuneration for participation in the Health Choice network. (TAC ¶ 100.)

The TAC, thus, alleges that participation in these programs functioned as a kickback to entice providers to join and/or remain in the Health Choice network and receive network referrals and patients. (TAC ¶ 79.) In doing so, Relators allege, the program allowed funds to flow from Health Choice to its own hospitals and favored providers without utilization review and/or cost control measures as required by Arizona law and its contract with AHCCCS. Relators also allege that the program allowed Health Choice to refer patients for other services, including diagnostic imaging, to its affiliates without scrutiny. (TAC ¶¶ 81, 92.) These Gold Card providers experienced considerably lower denial rates for services requested. (TAC ¶¶ 84-85.)

The Court agrees with Moving Defendants' contentions here. Doctors do not refer patients to Health Choice for care or purchase healthcare services from Health Choice. *See United States v. Group Health Co-op.*, No. C09-603 RSM, 2011 WL 814261, at *2 (W.D. Wash. Mar. 3, 2011) (granting dismissal of FCA claims where relators failed to adequately plead that conduct altered capitation payments). While the Court acknowledges the preferential treatment granted to providers under these programs, as well as its apparently drastic effect on approval rates for those providers, it declines to determine whether or not such treatment is remuneration under the statute as it is not necessary for the resolution of Moving Defendants' Motion. Nor does the Motion's resolution require a determination of whether or not the program resulted in any referrals or purchases under the terms of the statute. Instead, Relators have failed to adequately educe what financial benefit Health Choice would gain from its alleged kickbacks, or, more importantly, how Federal healthcare programs would face a loss under the same. Nor have Relators provided any precedent whatsoever holding that similar programs violate the AKS.

Given that Health Choice operates on a capitated payment system, it is too speculative to find that whatever benefits conferred to providers under these programs resulted in increased payments to Moving Defendants. In their Response, Relators appear to allege that by allowing more treatment and incorporating that into the encounter data by which future capitation payments will be calculated, Health Choice sought to artificially increase future revenue, thereby benefiting from more patient treatments and increasing governmental costs. (Resp. at 12-14.) This, too, is speculative, and Relators fail to allege any actual increase in rates. Further, if Health Choice's end goal was simply to approve as much treatment as possible—which is inherently in conflict with much of its business model and profit structure—Relators do not explain why Health Choice would only allow certain providers to join the uninhibited programs and not others, resulting in the approval of less overall care. Again, the Court can only speculate as to

whether Health Choice desired to funnel payments to only certain partners or affiliates—a theory not alleged or implied by Relators here.

In their Response, Relators also appear to allege an additional theory which hinges on the applicable MCO risk corridors. (Resp. at 12-14.) Under this theory, the government suffers financially when Health Choice's losses under the program exceed six percent, at which point any further losses are covered by the government. Accordingly, Relators allege, the open spigot to some providers under the preferential programs would eventually exceed the risk corridor and thus negatively affect the government without Health Choice incurring further loss and providing a potential windfall to IASIS-affiliated entities. (Resp. at 12-13.) Not only is this theory also speculative, because Relators do not allege that the risk corridors were exceeded, but the Court is limited to the allegations in the TAC and the sufficiency of those allegations. No claim regarding a desire to drive up capitation rates is found in the TAC; nor is there alleged a desire or plan by any Defendant to benefit from triggering risk corridors. The Court cannot consider novel theories first stated in Relators' Response. *See Acker v. McCormick*, 110 F.3d 67 (9th Cir. 1997) (declining to consider claims raised for the first time in responsive papers); *Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 (9th Cir. 1998) ("[i]n determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss"); 2 Moore's Federal Practice, § 12.34[2] (Matthew Bender 3d ed.) ("The court may not . . . take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a)."). Not only is the TAC devoid of such theories, but again Relators fail to allege any change in payment to Health Choice or from AHCCCS that would substantiate the purpose of or damage caused by such a scheme. Count I of the TAC based on these programs is therefore dismissed.

### 2.      Payment Under Partnership for Quality Outcomes Program

Moving Defendants also move to dismiss Relator's AKS claims based on the partnership for quality outcomes program pursuant to the safe harbor exception for Federally Qualified Health Centers ("FQHCs"). (Mot. at 13-14 (citing 42 U.S.C. §§ 1320a-7b(b)(3)(H) and 42 C.F.R. § 1001.952(w)). Under that exception, FQHCs may receive payments pursuant to written contracts designated for administrative and case management services. *Id.*

Relators again allege that, like the preferential programs already discussed, the grants made under the program were solely for the purpose of retaining providers' membership in the network, because Health Choice failed to track or cover any deliverables associated with the contracts. (TAC ¶¶ 109-10.) Relators allege that due to these grants, all claims submitted to Health Choice post-grant are considered false claims under the statute. (TAC ¶ 112.) However, the TAC fails to allege that the safe harbor provisions do not apply to the only specific grant Relators have identified. *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 993-97 (9th Cir. 2011) (affirming dismissal due to lack of allegations that conduct was not protected by safe harbor provisions). Relators have failed to even respond to Moving Defendants' argument and therefore waived any such argument. *See* LRCiv 7.2(i); *Currie v. Maricopa Cty. Cmty. Coll. Dist.*, No. CV-07-2093-PHX-FJM, 2008 WL 2512841, at *2 (D. Ariz. June 20, 2008). While Relators do attempt to clarify these allegations—though not the safe harbor provisions (Resp. at 27-28)—these assertions are not tethered to the allegations in the TAC and cannot be properly considered by the Court. *Raffle v. Exec. Aircraft Maint.*, No. 12-cv-0365-PHX-DGC, 2012 WL 4361409, at *3 (D. Ariz. Sept. 25, 2012). Accordingly, the Count I claims based on the partnership for quality outcomes program are also dismissed.

### 3.      Rule 9(b) Particularity

Because of the inherent flaws in Relators' AKS-based claims, the Court declines to unnecessarily examine those allegations' adequacy under Rule 9(b).

**B.      Claims Based on False Certification**

Count II of the TAC asserts violations of the FCA based on claims submitted for payment that certify compliance—expressly or impliedly—with various contractual and regulatory requirements material to government funds in violation of 31 U.S.C. §§ 3729(a)(1)(B).

Moving Defendants argue that Count II must be dismissed as its allegations: (1) do not identify any false statements in the records described, which Moving Defendants contend are not "claims" for payment (Mot. at 18); (2) fail to identify contractual or regulatory violations (Mot. at 23-33); and (3) fail to allege any such violations were material to payment (Mot. at 19-23).

The TAC alleges that automatic approval associated with Gold Card, Platinum status, code 99950, admin. approval, and appeals processes, as well as staffing errors and credentialing misconduct, circumvented the need for providers to demonstrate medical necessity, and providers were able to gain approval of services without preauthorization or substantive medical information in violation of the AHCCCS requirements, Arizona law and regulations, and contractual obligations. (*E.g.*, TAC ¶ 90.) Because Gold Card providers could order medical service without documentation, or review of cost effectiveness or medical necessity, the status allowed for the payment of services not Medicaid-covered under AHCCCS. (TAC ¶ 62.) Relators allege this practice resulted in the creation of false certifications and payment accuracy statistics for review by AHCCCS. (TAC ¶ 124.) The Court analyzes the parties' arguments in turn.

**1.      Submission of False Certification**

At the outset, Moving Defendants assert that none of Relators' allegations concern actual claims for payment as those terms are statutorily defined. (Mot. at 10-11.) Moving Defendants contend that, for Relators' theory to be actionable, the Court must equate encounter data with a provider's request for payment for individual services. (Reply at 10.) While Moving Defendants admit that Relators assert Health Choice's bills to AHCCCS, CMS, and other Federal health care program administrators constituted false

records, they contend that Relators fail to explain what those bills are or what false statements they contained. (Mot. at 18-21.) However, this argument, and those based on semantics regarding the difference between expenditures and claims that include certifications, are largely questions of fact that cannot be resolved on the pleadings. *See, e.g., U.S. ex rel. Satalich v. City of Los Angeles*, 160 F. Supp. 2d 1092, 1111 (C.D. Cal. 2001) (denying FCA Motion to Dismiss when claims turned on unresolved factual inquiries). The TAC alleges that Health Choice made false express and implied certifications in enrollment applications, reports, and other quarterly and financial performance reports that caused Arizona to make express false certifications to the federal government on CMS-37 and CMS-64 forms certifying that Defendants were in compliance with their obligations described therein. (TAC ¶¶ 43-45, 62, 179.) Moving Defendants respond that the forms submitted to CMS only certify that expenditures are "allowable" in accordance with applicable statutes and regulations, and that the only expenditures on those forms were AHCCCS capitation payments. (Mot. at 19.) Thus, Moving Defendants argue, the capitation payments to Health Choice would need to be not "allowed" for the certifications to be false. (Mot. at 19.) Relators have at least alleged that those capitation payments would not be allowable in these circumstances. While true that encounter data is not explicitly a submission of claim for payment, the data nonetheless are used to aggregate records of services rendered to Medicaid plan participants and determine future capitation payments based on these services, and they are encapsulated in CMS-37 and CMS-64 reports—all of which include an attestation regarding compliance with various laws and regulations, as Relators have alleged. Neither party has provided authority that definitively includes or excludes the types of documents Relators rely on as claims. Relators' claim that such documents included false certifications meet the pleading requirements at this stage.

### a.     Express Certification

Moving Defendants argue that Relators have not alleged that any express certification by Health Choice was false. (Mot. at 20.) However, the TAC alleges that the standards governing the operations and requirements delineated in A.R.S. § 36-2901 *et seq.* and Arizona Administrative Code ("A.A.C.") Articles 5 and 9-22-501 are incorporated by reference into every AHCCCS managed care contract, including Health Choice's. (*E.g.*, TAC ¶¶ 49-50.) The TAC also quotes language in both CMS-37 and CMS-64 requiring states to certify that the report includes expenditures under the Medicaid program "that are allowable in accordance with applicable implementing federal, state, and local statutes, regulations, policies, and the state plan approved by the Secretary . . . ." (TAC ¶¶ 43-45.) The TAC further alleges that Health Choice is required to submit encounter data as a condition of the CMS grant award (TAC ¶ 56 (citing 42 C.F.R. § 438.242(b)(1); 42 C.F.R. § 455.1(a)(2)), and that the reported services encapsulated in the encounter data "must be medically necessary and provided by a primary care provider, or other qualified providers as defined [herein]." (TAC ¶ 59 (quoting AHCCCS Medical Policy Manual, Ch. 300).) Relators also point to Health Choice's submission in response to AHCCCS's Request for Proposals, which emphasized that they only offer Gold Card status to physicians with a proven history of following guidelines, as another false statement, because Relators contend no factors were considered in granting Gold Card status. (TAC ¶ 79.) Relators allege that these programs create the impossibility of compliance with those provisions. Relators also allege that Health Choice cancelled or failed to update essential clinical tools and guidelines, reduced its prior authorization staff, and continued to use outdated criteria, allowing for claims to be paid to IASIS facilities without justification, medical necessity, or other underlying prerequisites for payment. (TAC ¶¶ 125-28.) Relators allege that the degradation of its tools and staff caused a reckless disregard as to medical necessity and disallowed the ability to apply consistent criteria to prior authorization decisions as required by the above provisions. (TAC ¶¶ 125-28.)

Relators further contend that 42 C.F.R. §§ 438.604 and 438.608 require that information submitted as part of the encounter data include a specific attestation that the data is in compliance with Subpart H of the Balanced Budget Act, is complete, accurate, and truthful, and is in accordance with all Federal and State laws, regulations, and policies. Relators allege that Health Choice, through its preferential programs and administrative transgressions, has completely ignored or eliminated any attempt to ensure medical necessity of claims. (*E.g.*, TAC ¶¶ 78-81, 90-90 [sic], 105, 117, 122, 125.) If true, this abdication would render Health Choice's encounter data reports—upon which AHCCCs relies in its CMS-37 and CMS-64 filings—false. Relators also point specifically to the attestation of accuracy in Health Choice's encounter data submissions. (TAC ¶¶ 60-62 (citing 42 C.F.R. §§ 438.604 and 438.608; Mot., Ex. B.) Relators allege that those encounter data submissions were reported as properly paid to AHCCCS, which could only be done if Health Choice were in compliance with its regulatory and contractual requirements for payment. (TAC ¶ 62.) Health Choice cannot escape liability simply by relying upon the preceding statement in that certification, which ties the accuracy only to the knowledge of the signatory. To do so would allow Health Choice to simply assign a party to sign all certifications who has no knowledge as to the truth, falsity, or accuracy of the certification.

As relied on by Relators in their submission of supplemental authority (Doc. 102), the court in *United States ex rel. Swoben v. United Healthcare Ins. Co.*, No. 13-56746, 2016 WL 4205941, at *3 (9th Cir. Aug. 10, 2016), recently disagreed with a similar argument that defendants' certifications were qualified and could not have been false because they did not *know* of any specific instances when signed. The Court notes that while the Medicare Advantage program and the regulations at issue—65 Fed. Reg. 40,268—in *Swoben* are distinct from those at issue here, particularly in their risk adjustment parameters that gives plans and providers additional funding for treating Medicare Advantage patients who are relatively unhealthy, Medicare Advantage nonetheless operates on a monthly capitated fee arrangement. Further, the court found

that defendants' review process was designed to deliberately "avoid identifying erroneously submitted codes that might otherwise have been identified with reasonable diligence," which no longer allowed them to "certify, based on information and belief, the accuracy, completeness, and truthfulness of the data submitted to CMS." *Swoben*, 2016 WL 4205941, at *8. Finally, the court found that the allegations that the defendants designed review procedures to avoid reporting information to the government stated a cognizable legal theory under the FCA. *Id.* As discussed, the Court is aware of the distinguishing factors in this case—both as pointed out by Moving Defendants and otherwise—and nonetheless finds Relators can similarly state a claim based on a similar framework and allegations regarding those attestations and certifications.

Moving Defendants also argue that there is no allegation that they provided or paid for medically unnecessary care. (*E.g.*, Mot. at 6.) However, Relators' allegations are that Moving Defendants submitted claims with reckless disregard or willful indifference as to whether or not the care was medically necessary—a fundamental requirement of MCOs. Though possibly not tied to any direct or immediate loss by the government, MCOs are nonetheless entrusted to ensure not only the expeditious, efficient, and cost-effective facilitation of care, but not to provide medically unnecessary or non-economical care. As a risk-sharing partner, MCOs serve, more or less, as a conduit or surrogate for Medicaid. They cannot, as Relators allege, abdicate their duties even if there is not a direct or immediate financial loss associated with those duties. Relators' allegations, taken as true, show that Moving Defendants had no information whatsoever regarding the medical necessity or cost-effectiveness of claims submitted through its various preferential programs and nonetheless certified compliance with each.

### b.    Implied Certification

Moving Defendants contend that none of the alleged conduct violates any obligation that is a condition of payment by AHCCCS. (Mot. at 20.) Instead, Moving Defendants argue, Relators have employed conclusory language and failed to identify the

contractual or regulatory provisions that support a contention that the payments were conditioned upon the allegedly violated provisions. (Mot. at 22.)

However, the TAC alleges that Health Choice agreed to comply with the contractual requirements—that it have in place and follow written policies and procedures for processing all requests for initial and continuing authorization for services—and that Health Choice made payments and submitted encounter reports to AHCCCS as properly paid absent compliance with these obligations. (Resp. at 11-12.) These include Arizona state law obligations, encounter data obligations, and other obligations under the AHCCCS Medical Policy Manual. (TAC ¶¶ 49-50, 53, 55-63, 67, 98.) Again, by alleging that Moving Defendants' actions in submitting claims as paid— inherently certifying compliance with the preceding obligations—and attesting to the accuracy in their encounter data submissions, Relators allege several implied certification claims. (TAC ¶ 179; Resp. at 11-12.) Relators' claims are not conclusory and identify specific breaches of Moving Defendants' obligations.

This is not to say Moving Defendants' arguments are without merit—many are well taken. Indeed, Relators' claims often appear to be alleging violations of conditions of participation, rather than payment. These claims are only sufficient if the plaintiff asserts liability on a fraudulent inducement theory—which Relators apparently dropped in this iteration of the pleading (Doc. 14, ¶¶ 171-74.) The Court will not address arguments not raised by Relators or briefed by the parties. *See Greenlaw v. United States*, 554 U.S. 237 (2008) ("as a general rule, our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief"). Elsewhere, Relators come perilously close to pleading an after-the-fact breach of contract, which is not actionable under the FCA. *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005) ("fraud requires more than a breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something it plans not to do"). However, in its

totality, and in light of *Swoben* and other relevant precedent, the TAC adequately alleges claims based on implied certification.

### 2.     Regulatory and Contractual Violations

Moving Defendants next contend that none of the regulatory or contractual violations alleged are properly described or constitute FCA violations. (Mot. at 16-33.) The Court analyzes each alleged violation in turn.

### a.     Prior Authorization

Moving Defendants claim that the waiver of prior authorization associated with the Gold Card, Platinum status, code 99950, and admin. approval programs fails to create FCA liability because neither their contract with AHCCCS nor applicable statutes require Health Choice to impose prior authorization universally, and even when required, it is not a condition of payment. (Mot. at 23.) Instead, Moving Defendants state that prior authorization is purely a cost-control measure that an MCO is authorized to employ, the use of which is only regulated to ensure that, when applied, it is done consistently. (Mot. at 24.) Similarly, Health Choice notes that its contract provides "wide latitude" in implementing prior authorization systems, and that the TAC fails to allege any inconsistent application. (Mot. at 25-26.)

However, the law does require that written policies be in place and that those policies be applied consistently. 42 C.F.R. § 438.210(b). Further, Arizona law mandates policy application in some circumstances. A.A.C. § R9-22-522. Moving Defendants' argument here hinges on whether or not they are required to apply policies at all. The argument is not persuasive. It is illogical to suggest Congress would require written policies but not require their use. Relators have properly alleged the obligations above, as well as sufficient indicia of noncompliance with those obligations.

### b.     Utilization Review and Appeal Practices

Moving Defendants similarly contend that the waiver of utilization review and alteration of appellate procedures do not violate statutory, regulatory, or contractual provisions. (Mot. at 27.) They further state that a payor is not statutorily or contractually

required to institute a policy for adjudicating claims or to use a medical professional to approve a claim or overturn a denial, and that the TAC fails to identify services that were not in fact medically necessary or cost effective. (Mot. at 27-28.)

The TAC does allege that Health Choice waived utilization review and standard appeals processes for certain providers—usually controlled or affiliated with IASIS—causing payment of claims without justification, medical necessity, or other underlying prerequisites. (TAC ¶¶ 129-39.) Because dispute resolution mechanisms must rely upon consistent medical criteria and must be based on medical necessity with documentation, Relators argue these deficiencies illustrate reckless disregard or deliberate ignorance of whether or not those claims met the statutory, regulatory, and contractual requirements for covered services. (TAC ¶¶ 129-39.) As with prior authorization, federal and state regulations require that an MCO have written policies and procedures in place apply criteria consistently. 42 C.F.R. § 438.210(b); A.A.C. §§ R9-22-522(B)(1), (B)(5); AMPM, Ch. 1000, 1010-1 to 1010-2. Further, the contract states that the services must be "medically necessary" and "cost effective." Contract § D-10, 36. While it does not prescribe particular methods for ensuring either, some method of determining both is necessary. The waiver of prior authorization and appellate review alleged in the TAC avers that, for large swaths of claims, there is no method or attempt to determine either medically necessity or cost effectiveness. The TAC's allegations regarding the reversal of claims denied due to medical necessity or other vital requirements, taken as true, strongly implies abdication of the obligations as well.

### c.   Credentialing

Moving Defendants argue that the TAC identifies no statutory, regulatory, or contractual provision that the alleged credentialing conduct violates (Mot. at 30), and that Health Choice was neither obligated to credential all providers serving Medicaid patients nor refuse to pay out-of-network providers (Mot. at 31-32). Moving Defendants also argue that Relators have failed to identify an uncredentialed doctor who provided any

specific, unpayable claim, or what certification was false in connection with such a payment. (Mot. at 32-33.)

Again, Health Choice is required to have written processes in place to credential providers and must credential a provider network. AMPM, Ch. 900, 950-1; A.A.C. § R9-22-522(B)(5)(m). The TAC also alleges that AHCCCS requires services to be rendered by providers that are appropriately licensed or certified. (TAC ¶ 68.) Relators allege specific instances of executive leadership discussing the backdating process and attempts to circumvent discovery of its credentialing processes. (TAC ¶ 142.) To read the requirements as necessitating procedures to credential and credentialing itself, but not require that such credentialing actually occur or that Health Choice use credentialed providers, is another insupportable contention. The allegations of the TAC regarding backdating suggests that credentialing was knowingly required and that such processes were to take place before authorizing care, or at least on some schedule that Health Choice failed to comply with.

Because their contract with AHCCCS and A.A.C. Title 9 Chapter 22 require Moving Defendants to assure that services under their plans are delivered by providers who have been properly credentialed and meet quality standard providers, the backdating and credentialing alleged in the TAC constitutes, at least, a reckless disregard of medical qualification of providers and could serve to provide false and misleading statistics on timeliness for credentialing as required by their AHCCCS contract. Further, the TAC provides a representative example of an uncredentialed provider operating in the network. (TAC ¶ 141.) The TAC also alleges that all providers rendering services to Arizona Medicaid recipients must have enrollment completed with AHCCCS (TAC ¶ 70) and that the provider must comply with all federal, state, and local laws, rules, regulations, policies, standards, and executive orders (TAC ¶ 71). Relators have sufficiently alleged claims based on credentialing.

### d.      Rule 9(b) Particularity

Moving Defendants argue that the alleged contractual and regulatory violations regarding prior authorization, utilization review, appellate process, and credentialing are not pled with sufficient particularity under 9(b). Specifically, Moving Defendants argue that Relators fail to allege how Health Choice's prior conduct violated its legal or contractual obligations, what certifications were made, and in support of which claims for payment its conduct was associated, as required by Rule 9(b). (Mot. at 26.) Moving Defendants argue that the TAC fails to identify who at Health Choice authorized additional services or how the overrides alleged were improper. (Mot. at 29.) As to each of these arguments, the Court disagrees.

First, while Relators, as insiders, are required to have a certain degree of factual knowledge regarding the alleged wrongdoing, *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051-52 (9th Cir. 2001), they cannot reasonably be expected to allege details about each of the individual claims that were submitted, *see, e.g., U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.*, 579 F.3d 13, 29 (1st Cir. 2009). Instead, it is sufficient to allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* In short, to comply with Rule 9(b), Relators' allegations of fraud must be "specific enough to give [the defendant] notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly–Magee*, 236 F.3d at 1019. Relators' TAC meets this standard. Any inability to provide further examples or specific names, providers, or costs does not preclude them from adequately pleading a false claim. A relator is unlikely to have access to the particular certifications or to underlying data, and precluding a plaintiff from asserting a FCA cause of action because of a lack of access to particular paperwork would excise much of *qui tam* litigation. *See, e.g., U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009). Under controlling authority, Relators need not "identify representative examples of false claims to support every

allegation." *Ebeid*, 616 F.3d at 998. Relators, therefore, need not identify specific false certifications.

Second, to the degree Moving Defendants argue that the TAC does not set forth the role of each Defendant or individuals at each Defendant, (Mot. at 32), a complaint satisfies Rule 9(b) if it adequately alleges that the employees of the company "oversaw or actively participated in the alleged fraudulent scheme," *Corinthian Colls.*, 655 F.3d at 998. The TAC does so, at least with regard to Health Choice and IASIS.

Further, the TAC provides examples of claims being approved despite previous denials for lack of documentation (TAC ¶¶ 90-92), the operation of the appellate process (TAC ¶¶ 132-39), uncredentialed physicians providing care (TAC ¶ 141), and the backdating of such credentialing (TAC ¶¶ 140-42). Relators also point to emails regarding compliance concerns and enough facts to demonstrate the legal and financial complications that may arise from these programs.

Relators have pled indicia of improper authorization of additional or medically unnecessary services by *someone* at Health Choice. While Moving Defendants argue that Relators rely on "blind conjecture" that unnecessary service *might* have been paid (Mot. at 30), the Court disagrees. Although some degree of speculation is necessary to give Relators' claim credence, it is far from blind. Relators' statistics and allegations regarding the processes provide far more than a suggestion that some of the medical services were unnecessary. It would be surprising were at least some of the services provided *not* unnecessary, given the total lack of prior authorization, utilization, and appellate review applied to an abundance of claims. Indeed, FCA liability only attaches to the "natural, ordinary and reasonable" consequences of conduct. *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 669 (2008). Here, the natural consequences of removing all semblance of any review for medical necessity and granting automatic approval would naturally, ordinarily, and reasonably lead to the provision of medically unnecessary care—which the TAC alleges would render certifications false and violate the FCA.

### 3.     Materiality[4]

For Relators to establish a false certification claim, the certification must be material to the payment made by the government, *Hendow*, 461 F.3d at 1171, and must be a prerequisite to obtaining the government benefit, *Hopper*, 91 F.3d at 1266. Moving Defendants argue that the TAC inadequately describes what the alleged bills were for, when and how they were submitted, and what information they purportedly alleged. (Mot. at 17-18.) Moving Defendants also claim that Relators fail to allege what false statements were contained in the bills, and therefore fail to adequately allege that the certifications were material to the payment of money to Moving Defendants. (Mot. at 19-23.) In doing so, they argue such bills cannot be material, or cannot be inferred as material from the allegations in the TAC.

The Supreme Court recently concluded that, despite its fact-intensive nature, materiality is an issue upon which courts may base an FCA dismissal. *See Universal Health Servs., Inc. ex rel. Escobar v. United States,* 136 S. Ct. 1989, 1993 (2016). The Supreme Court further stated that the standard for pleading materiality is "rigorous" and that FCA plaintiffs must "plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality." *See id.* The *Escobar* Court rejected a theory of materiality that any statutory, regulatory, or contractual violation is material just because it can result in

---

[4] Moving Defendants argue in a footnote that Relators mischaracterize the third element of an FCA claim—scienter—but do not address the requirement further, other than to say that their qualifying statements of personal knowledge in certifications rule out scienter. (Mot. at 33 n.31.) Although the FCA's scienter requirement is "rigorous," Relators' allegations satisfy it here. The FCA itself provides that "no proof of specific intent to defraud" is required to satisfy the scienter requirement. 31 U.S.C. § 3729(b)(1)(B). *See, e.g., Castillo–Villagra v. INS*, 972 F.2d 1017, 1026 (9th Cir. 1992). In short, "[s]o long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach." *Hendow*, 461 F.3d at 1172. Relators' claims regarding false certifications are rife with allegations of reckless disregard as to the truth or falsity of compliance requirements and deliberate ignorance to those attestations. Further, Moving Defendants cannot escape liability by deliberately failing to investigate any claims. Nor can they escape liability for not applying standard criteria or by failing to review whatsoever. Such conduct cannot serve to preclude Relators from satisfying the scienter standard.

the government's decision not to pay a claim. *See Escobar*, 136 S. Ct. at 2004. The Court gave examples as to how an FCA plaintiff might adequately plead a term's materiality, such as alleging that the government consistently refuses to pay claims that violate the allegedly material term. *See id.* at 16. Relators contend that materiality under *Escobar* is case-specific and fact intensive, and that the TAC alleges that any reasonable person would assume that the MCO contractors' compliance with their obligation to protect and properly expend state and federal funds is material. (Resp. at 20-21.)

Initially, the Court notes that the purpose of managed care is not simply to shift risk and cost, as Moving Defendants suggest. While MCOs certainly have broad discretion on how to accomplish both, Relators are correct in their assertion that the purpose of managed care is to recommend, direct, coordinate, and organize the furnishing of services to a program's enrollees from its network of participating healthcare providers. (Resp. at 5 (citing 80 Fed. Reg. 104 (June 1, 2015).) Further, utilization management, including prior authorization, is a material federal regulation, state regulation, and contractual obligation of the contractor (Resp. at 6), and Health Choice's contract requires its subcontracted providers to follow written policies and procedures for processing requests for initial and continuing authorizations of services. (Resp. at 6 (citing 42 C.F.R. § 438.210(b)(1)).) Relators have alleged that Health Choice agreed to comply with those contractual requirements regarding processing of requests for initial and continuing services, failed to comply with such requirements, made payments to providers, and reported those encounters as properly paid knowing they were not incompliance with the material obligations. (TAC ¶¶ 49-50, 54-63, 65-66, 71.) As a whole, these sufficiently plead materiality.

A legal or contractual violation alone is not enough. *Cafasso*, 637 F.3d at 1057. But Relators cite contractual language and references in that contract to suggest that the government would not have paid Health Choice the capitation rates if Health Choice had provided truthful encounter data or if it knew of Health Choice's reckless disregard in ensuring that provided care was medically necessary as required by various contractual

and regulatory provisions. (*E.g.* TAC ¶¶ 49, 63, 65, 66, 145.) The TAC's citation to similar, redundant, or identical provisions requiring each substantiates its claim that these processes are fundamental to Medicare and Medicaid operation and material to any governmental decision to pay claims.

The TAC alleges that AHCCCS required that all funds be both medically necessary and cost effective and cites to specific provisions regarding the same. (TAC ¶¶ 59, 63, 91, 174.) The TAC also alleges the guidelines, policies, and manuals are incorporated into Health Choice's contract. (TAC ¶¶ 49-50, 63, 65, 71.) The TAC specifically avers that the Quality Management/Utilization Management Requirements are incorporated by reference into the relevant contract and require utilization management, the determination of medical necessity, and, at least, prior authorization for non-emergency or scheduled hospital admissions. (TAC ¶ 65 (citing A.A.C. R9-22-522).) The TAC also alleges that such incorporated guidelines require credentialing of network providers and standard application of written practice guidelines. (*E.g.*, TAC ¶ 69.) All of these allegations and citations give rise to the inference that AHCCCS's payments were contingent on compliance with the terms and conditions of that contract, including the incorporated clauses. (*E.g.*, ¶ 59 (citing 42 C.F.R. § 438.242(b)(1); 42 C.F.R. § 455.1(a)(2)).) Taken together, the TAC adequately alleges that Health Choice falsely certified compliance with all relevant contractual and regulatory principles, both explicitly present and incorporated into the contract. Relators allege this compliance was material to IASIS's ability to receive payment on the project and goes to the essence of the bargain of the government's agreement. Indeed, the alleged obligations are the *sine qua non* of government payment. These allegations meet the *Escobar* standard that such noncompliance would have a natural tendency to influence or be capable of influencing the payment or receipt of money or property. *Escobar*, 136 S. Ct. at 1996.

Moving Defendants make much of the distinguishing factors between Relators' allegations and those in *United States v. Science Applications Int'l Corp.*, 262 F.3d 1257, 1271 (D.C. Cir. 2010). (Reply at 15 (testimony regarding whether the government would

have signed the contract had it known of the violation, certifications in the contract renewal process that defendants were in compliance, and the explicit right to terminate the contract if certain provisions were violated).) However, many of these factors are either alleged by Relators here or are simply premature given the posture of this action. This claim is sufficiently pled.

## C. Conspiracy

Count III of the TAC asserts a conspiracy to violate the False Claims Act in violation of 31 U.S.C. § 3729(a)(1)(C). This provision creates liability for any person who "conspires to commit a violation" of the FCA.

### 1. Essential Elements of Conspiracy

Moving Defendants argue that Relators have not pled facts showing the existence of an unlawful agreement between Defendants or an overt act in furtherance of that agreement. (Mot. at 33.) Both the TAC and Response provide few answers to Moving Defendants' charge. While the existence of a conspiracy is a question of fact, Moving Defendants are correct that Relators must plead sufficient facts. (Reply at 16 (citing *Iqbal*, 556 U.S. at 679).)

First, to the extent Relators' conspiracy claims are based on a conspiracy to violate the FCA via AKS-violations, those claims fail because the Court found no properly pled AKS violations. Second, in regards to the surviving FCA violations, Relators' allegations are almost solely pointed at Moving Defendants as certifying the false claims allegedly submitted. While Relators allege or imply that providing clinics benefitted from the scheme due to lack of oversight in their submissions or simply increased approval of care, they do not provide factual support that the providers agreed to conspire with Health Choice, or were even aware of the alleged scheme. There are no factual allegations in the TAC regarding a provider's participation in the submission of claims to be paid by AHCCCS whatsoever—other than to Moving Defendants—which does not trigger a FCA violation. For these reasons, the Court must dismiss Count III.

### 2.    Rule 9(b) Particularity

Moving Defendants also argue that the TAC fails to discern between individual Defendants and does not meet Rule 9(b)'s particularity standard.[5] (Mot. at 33-34.) For this independent reason, the Court agrees that Relators fail to adequately state a conspiracy claim. As discussed, particular Defendants' agreement and role in the alleged scheme are not identified. Relators' attempt to identify these key factors in their Response is also insufficient. Further, for much of the TAC, it is impossible to discern each alleged participant's activity. *Calisesi*, 2015 WL 1966463, at *13 (dismissing FCA conspiracy claim for failure to plead "which Defendants conspired with which or any facts regarding an agreement or overt act"). Relators not only fail to plead who at each Defendant agreed with whom to violate the FCA, or how, but what acts were done by each Defendant in furtherance of such agreement(s).

As Moving Defendants point out, even if the Court could consider it, Relators' Response fails to clarify this and does not refer to conduct by individually-identified providers. (Reply at 18.) "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum identify the role of each defendant in the alleged fraudulent scheme." *Corinthian Colls.*, 655 F.3d at 997-98. While Relators may avoid this requirement by alleging identical conduct by multiple defendants in a singular scheme, that is not the case here. Relators have thus failed to adequately allege any of the required elements of a conspiracy.

While the Response ostensibly provides the who, what, when, where, why, and how—though many of those allegations are also vague—it does not tether each category to the next. (*See* Resp. at 28-30.) In providing the who, Relators largely list all Defendants. (Resp. at 28.) In providing the what, Relators list and cite the TAC's allegations as a whole. (Resp. at 29-30.) Relators do not, however, tie any Defendant to

---

[5] In a separate Motion to Dismiss (Doc. 90), Defendant Genesis OB/GYN, P.C. join in Moving Defendants' Motion, and made similar, non-separate arguments for dismissal regarding Rule 9(b) particularity, so the Court considered their arguments together with those of Moving Defendants.

any specified allegation. Nor do they state what specific conduct occurred where or when—only that the conduct occurred in Arizona offices and other locations in the Phoenix area and "throughout Arizona, specifically Flagstaff and [Tuscon] . . . ." (Resp. at 28-30.) At bottom, Relators fail to provide the most basic requirements under 9(b) (*i.e.* Defendant A, violated B, on C, at D, with E, by F and G), further warranting dismissal of Count III.

### 3.        Intra-Corporate Conspiracy Doctrine

Moving Defendants separately move to dismiss Count III—at least against its affiliates—arguing that, as a matter of law, they cannot conspire together because each is a fully owned subsidiary of IASIS. (Mot. at 34-35; *see also* Docs. 36, 38-43 (identifying IASIS Healthcare LLC as the corporate parent of Mountain Vista Medical Center LP, St. Luke's Behavioral Hospital LP, St. Luke's Medical Center, Health Choice Management Company Incorporated, Health Choice of Arizona Incorporated, Heritage Technologies LLC, and Physician Group of Arizona).)

Moving Defendants' argument relies on the intra-corporate conspiracy doctrine— an antitrust principle—which "provides that, as a matter of law, a corporation cannot conspire with its own employees or agents." *Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055, 1057 (C.D. Cal. 2000). Generally, the doctrine recognizes that corporate entities must act through their agents and employees and that this collaborative decision-making process is not conspiratorial when the agents and employees are acting within the scope of their duties. The reasoning behind this doctrine is that "it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself, just as it is not possible for an individual person to conspire with himself." *Microsoft Corp. v. Big Boy Distribution LLC*, 589 F. Supp. 2d 1308, 1322 (S.D. Fla. 2008). Courts have used this principle to bar conspiracy claims where the purported conspirators were a parent corporation and a wholly-owned subsidiary. *See, e.g., United States ex rel. Chilcott v. KBR, Inc.*, No. 09-CV-4018, 2013 WL 5781660, at *10-11 (C.D. Ill. Oct. 25, 2013) (collecting cases); *United States v. Medco Health Systems, Inc.*, No. 12–

522(NLH)(AMD), 2014 WL 4798637, at *11 (D.N.J. Sept. 26, 2014) ("The intra-corporate conspiracy doctrine, raised by defendants, contemplates the ramifications of this type of parent/subsidiary relationship. The doctrine provides that a wholly owned subsidiary is deemed incapable of conspiring with its parent company, and it has long been applied to conspiracy claims generally."); *United States ex rel. Peretz v. Humana Inc.*, No. 2:08-CV-1799-HRH, 2011 WL 11053884, at *10 (D. Ariz. Apr. 8, 2011); *United States v. Summit Healthcare Ass'n, Inc.*, No. CV-10-8003-PCT-FJM, 2011 WL 814898, at *4 (D. Ariz. Mar. 3, 2011).

Relators contend that this doctrine does not definitively bar the type of alleged conspiracy, particularly outside the Sherman Antitrust Act. (Resp. at 34-36.) Relators rely on state court decisions in other jurisdictions for their argument that that the theory does not extend beyond antitrust actions. (Mot. at 35 (citing *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020 (Del. 2007); *MGW Inc. v. Fredricks Dev. Corp.*, No. G006654, 1990 WL 272149, at *4 (Cal. Ct. App. Apr. 30, 1990), *cert. granted, judgment vacated sub nom. Pac. Lighting Corp. v. MGW, Inc.*, 499 U.S. 915; *SEECO, Inc. v. Hales*, 22 S.W.3d 157, 172 (Ark. 2000); *Grizzle v. Tex. Commerce Bank, N.A.*, 38 S.W.3d 265, 284 (Tex. Ct. App. 2001)).)

The Supreme Court has stated that "antitrust law's intracorporate conspiracy doctrine . . . turns on specific antitrust objectives." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166 (2001). However, courts have not construed the intra-corporate conspiracy doctrine as narrowly as Relators contend, and a number of courts have applied it in FCA cases. *See, e.g., Chilcott*, 2013 WL 5781660 at *4 ("the Court holds that the intracorporate conspiracy doctrine bars FCA conspiracy claims where all the alleged conspirators are either employees or wholly-owned subsidiaries of the same corporation"); *Ruhe*, 929 F. Supp. 2d at 1038 (C.D. Cal. 2012) ("Contrary to Relators' assertion, this doctrine applies to conspiracy claims outside of antitrust, where it was originally developed, and has in fact been applied by several federal courts to claims under the FCA."); *United States ex rel. Fago v. M & T Mortg. Corp.*, 518 F. Supp. 2d

108, 117–18 (D.D.C. 2007) (applying the doctrine in the FCA context). Relators contend that Moving Defendants conspired with each other to violate the FCA when those IASIS-affiliated entities submitted claims to Health Choice knowing that they would not encounter any prior authorization or administrative review. Thus, the alleged conspiracy is largely between IASIS (the ultimate parent company of all other Moving Defendants) and its subsidiary entities. These allegations describe conduct that lies at the core of what is non-conspiratorial under the intracorporate conspiracy doctrine. Relators point to no controlling authority rejecting application of the doctrine in the FCA context. For this independent reason, Relators' conspiracy claims against the Moving Defendants are dismissed with prejudice.

### D.     Health Choice Management Co. and Defendant Providers

Moving Defendants argue that the TAC fails to state a claim against HCMC because Relators fail to allege any action by the entity at all. (Mot. at 35.) The Court agrees. The allegations regarding HCMC in the TAC are conclusory and fail under both Rules 8(a) and 9(b) as they do not allege any HCMC conduct relevant to any of the Relators' claims. Relators failed to rebut this argument in their Response and have therefore waived any further opposition. (Mot. at 35; Reply at 3); LRCiv 7.2(i); *Currie*, 2008 WL 2512841, at *2. Claims against HCMC are dismissed with prejudice.

The same equally applies to the failure to serve Health Choice Northern Arizona LLC and SCMC (Reply at 3), and the Defendant providers in general. In addition to the dismissal of claims against entities as already discussed, and for the reasons stated throughout this Order, Relators' claims as alleged can only be maintained against Health Choice and IASIS. While Moving Defendants argue that claims against IASIS have not been properly pled, Relators have alleged that IASIS controlled, both legally and in the ordinary course of business, the activities of Health Choice and actively participated in wrongful conduct in the TAC. (*E.g.* TAC ¶ 159.) This is sufficient. Claims against all other parties are not, and are therefore dismissed.

E.      **Possible Amendment**

Moving Defendants seek dismissal of the TAC with prejudice. (Mot. at 37-38.) Relators seek leave to amend any dismissed claims (Resp. at 37), which Moving Defendants argue would be futile and because amendment would waste the Court's time and burden Moving Defendants with substantial litigation costs (Mot. at 37-38).

Federal Rule of Civil Procedure 15 provides that leave to amend should be freely granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). Hence, "[t]he standard for granting leave to amend is generous. *Corinthian Colls.*, 655 F.3d at 995; *see also Lopez v. Smith*, 203 F.3d 1122, 1127-30 (9th. Cir. 2000). "The power to grant leave to amend, however, is entrusted to the discretion of the district court, which determines the propriety of a motion to amend by ascertaining the presence of any of four factors: bad faith, undue delay, prejudice to the opposing party, and/or futility." *Serra v. Lappin*, 600 F.3d 1191, 1200 (9th Cir. 2010) (internal quotation omitted)). In assessing futility, "denial of a motion to amend is proper if it is clear that the complaint would not be saved by any amendment." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013).

The shortcomings in Relators' AKS-based claims, conspiracy claims, and those against provider Defendants are fundamental. Even if some flaws could be cured by amending to provide additional particularity, these claims could not be saved by amendment as those claims, even with amendment, could not "plausibly give rise to an entitlement to relief" under the FCA. *Iqbal*, 556 U.S. at 679. For the reasons discussed, Relators have failed to state a claim for FCA liability based on AKS violations, any claims against provider Defendants, or any actionable conspiracy under the FCA. That Relators have had ample time, opportunity, and that these iterative pleadings have now been pending for 17 months, though not dispositive, also militates against further leave to amend. Amendment as to these theories of FCA liability would thus be futile and those claims are dismissed with prejudice. *See Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) ("dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment") (internal quotation marks and citations

omitted). Finally, while Relators note that *Escobar* was published during the pendency of the TAC (Resp. at 37), therefore militating in favor of leave to amend, Relators' implied certification theories based on that framework are not being dismissed.

**IT IS THEREFORE ORDERED** granting in part and denying in part Moving Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. 78), as detailed in this Order. Counts I, III, and IV are dismissed with prejudice. Count II remains pending as to Defendants IASIS and Health Choice; as to all other Defendants, Count II is dismissed with prejudice.

**IT IS FURTHER ORDERED** granting Genesis OB/GYN, P.C.'s Motion to Dismiss. (Doc. 90.)

**IT IS FURTHER ORDERED** that Defendants IASIS and Health Choice shall file an Answer to Count II of the Third Amended Complaint (Doc. 67) by November 21, 2016.

Dated this 8th day of November, 2016.

Honorable John J. Tuchi
United States District Judge